MGD

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Mario Rene Hidalgo Lopez, individually and as successor in interest to the deceased Raquel Evangelina Calderon de Hidalgo,

Plaintiffs, et al.,

v.

CoreCivic, et al.,

Defendants.

No.  CV 19-04332-PHX-ROS (CDB)

**ORDER**

Plaintiffs Mario Rene Hidalgo Lopez, widower of decedent Raquel Evangelina Calderon de Hidalgo (hereinafter "Decedent"), and Decedent's minor children, B.H. and L.H., brought this civil rights action through counsel pursuant to 42 U.S.C. § 1983, the Federal Tort Claims Act (FTCA), and Arizona state law regarding the death of Decedent while she was incarcerated in a CoreCivic facility in Eloy, Arizona.  (Doc. 52.)  Pending before the Court is Defendant CoreCivic's Motion to Dismiss, which Plaintiffs oppose. (Docs 54, 55.)

## I.    Fourth Amended Complaint

In their Fourth Amended Complaint (Doc. 52), Plaintiffs relevantly allege as follows.  On or about November 17, 2016, Decedent was arrested near Robles Junction, Arizona by the U.S. Border Patrol.  (*Id.* ¶ 17.)  For 3 days, Decedent complained to Border Patrol agents and officials about severe pain.  (*Id.* ¶ 18.)  On November 20, 2016, Decedent was sent to Banner University Medical Center where a urinalysis and complete metabolic

panel revealed abnormal labs and an x-ray of the right tibia fibula revealed mild soft tissue edema of the right foot. (*Id.*) Decedent was diagnosed with ankle sprain, soft tissue injury of her right knee and ankle, and headache due to trauma. (*Id.*) The physician gave Decedent instructions on how to care for her ankle, a prescription for ibuprofen, and ordered her to follow up with a primary care provider. (*Id.*)

On November 23, 2016, Decedent was transferred to Immigration and Customs Enforcement (ICE) custody at the Eloy Detention Center (EDC), which is owned and operated by Defendant CoreCivic. (*Id.* ¶ 19.) Decedent was suffering from injuries when she arrived and needed proper nourishment and medical treatment. (*Id.*) During a medical pre-screening, RN Bradford designated Decedent as "priority one (PRI-1)," which meant Decedent needed to be seen by a provider before being sent to housing.[1] (*Id.*) Bradford based this designation largely on Decedent's emergency room paperwork from Banner University Medical Center. (*Id.*) During a subsequent medical and mental health intake screening, Bradford designated Decedent as "Physical Examination – Complex," which meant she required a physical examination by a provider within 24 hours. (*Id.* ¶ 20.) Bradford informed the clinic's Nurse Practitioner (NP) Luz Bradberry, who was employed by Defendant Ingenesis, of Decedent's injuries, ailment and vitals, but failed to tell Bradberry that Decedent's pain level was 7/10. (*Id.*) Bradberry states that she went to the intake area and called "Calderon's" name and when she did not receive a response from Calderon, she moved on the next detainee and deemed Decedent's issue as non-urgent. (*Id.*) Bradberry scheduled Decedent's physical examination with a provider for 2 days later with Ingenesis employee NP Freddy Montenegro, thereby disregarding the meanings of "PR-1" and "Physical Examination — Complex." (*Id.*)

That afternoon, Decedent was transferred to Echo 600, a medical clearance unit for possible varicella exposure. (*Id.* ¶ 21.) CoreCivic Officer Refugio Castillo noticed Decedent's limp and she told him she hurt her ankle crossing the border. (*Id.*)

---

[1] It is not clear if Bradford worked for ICE Health Services Corps (IHSC) or for Defendant Ingenesis, which contracts with IHSC to provide staffing and support at the EDC medical clinic. (*See* Doc. 52 ¶¶ 9, 19.)

NP Bradberry ordered Decedent to take daily doses of ibuprofen and acetaminophen as keep-on-person medications, but the EDC pharmacy was closed at this time and the nursing staff did not retrieve the medications for Decedent from the overnight stock cabinet, which caused Decedent's pain and condition to worsen. (*Id.* ¶ 22.) The next day, Decedent told Ingenesis employee RN Michelle Wilkie during nursing rounds that her ankle pain level was 9/10, and Wilkie gave Decedent a one-day supply of ibuprofen and acetaminophen and told her to alternately apply cold and hot compresses. (*Id.* ¶ 23.)

Decedent was supposed to have her scheduled physical exam on November 25, 2016, but there were too many patients in the Echo 600 unit and NP Montenegro did not examine Decedent. (*Id.* ¶ 24.) Later that day, Decedent was moved to Bravo 300, a general population unit, where she was assigned to an upper bunk by CoreCivic staff, despite her sprained ankle. (*Id.*) After this move, a pharmacy technician filled her prescription and attempted to deliver it to the Echo 600 unit, but when the technician did not find Decedent there, he returned the medications to a pharmacy bin designated for later delivery. (*Id.*) The technician did not inform the nurse that the medications needed to be delivered and the medications were never provided to Decedent. (*Id.*)

On November 26, 2016, Decedent went to the medical unit because she was in pain and reported that her pain was 9/10. (*Id.* ¶ 25.) RN Bradford checked Decedent's vitals and noted that her pulse was high at 120 beats per minute and she had low oxygen saturation level. (*Id.*) Bradford did not have an interpreter and communicated with Decedent using hand motions. (*Id.*) Bradford later notified NP Montenegro that Decedent needed to see a provider, but Montenegro did not see Decedent at that time. (*Id.*) While Decedent waited to see Montenegro, there was a shift change and CoreCivic Officer Castillo put Decedent's identification card in the stack indicating that she had been seen by a provider and was cleared to be sent back to her unit. (*Id.* ¶ 26.) The new officer on duty, Kassandra Cienfuegos, sent Decedent back to the Bravo 300 unit without receiving treatment or seeing a provider. (*Id.*) When she returned to her unit, Decedent reported that she did not receive treatment and was still in tremendous pain. (*Id.*) Officer Erica

Villalobos reported to the Desk Officer, Joaquin Archiniega, that Decedent was crying and complaining of pain, and Archiniega agreed to contact medical, but never did.  (*Id*.)

On November 27, 2016, at 9:24 a.m., Decedent was ordered to walk outside by CoreCivic employees for recreation call.  (*Id.* ¶ 27.)  Decedent collapsed while in the yard and experienced a seizure; she was said to be foaming at the mouth and appeared to have urinated on herself.  (*Id*.)  At 9:28 a.m., NP Montenegro, RN Kwenoze Forelemu, and LNP Tyler McHugh arrived and took Decedent's vitals, which showed a pulse of 130 beats per minute and a low oxygen saturation level of 95%.  (*Id*.)  At 9:34 a.m., six minutes after Decedent's vitals were taken, EDC central control called 9-1-1.  (*Id*.)  At 9:39 a.m., the nurses and Officer Ferraro took Decedent to the medical unit and during the transport to medical, Decedent had a second seizure.  (*Id*.)  Once at the medical unit, Decedent's oxygen saturation level was 76% and she was put on oxygen.  (*Id*.)  Sometime between 9:45 a.m. and 9:50 a.m., Eloy Fire District arrived and transported Decedent to Banner Casa Grande Medical Center, arriving at the medical center at 10:20 a.m.  (*Id.* ¶¶ 27-28.)  Over the next 57 minutes, Decedent coded and was resuscitated 3 times.  (*Id.* ¶ 28.)  She was pronounced dead at 11:17 a.m.  (*Id*.)

An autopsy was performed, and Decedent's death certificate listed her immediate cause of death as Pulmonary Embolism due to, or as a consequence of, deep vein thrombosis.[2]  (*Id.* ¶ 29.)  The Emergency Physician noted that Decedent's cardiac arrest was "very much in question" given her young age and that she "presumptively had no cardiac history."  (*Id.* ¶ 30.)

In Count One, Plaintiffs assert a negligence claim under the FTCA against Defendant United States.  In Count Two, Plaintiffs asserts a negligence claim against Defendant CoreCivic.  In Count Three, Plaintiffs assert a negligence claim against Defendant Ingenesis.  Plaintiffs seek compensatory damages against all Defendants,

---

[2] Deep vein thrombosis occurs when a blood clot forms in one or more of the deep veins in one's body, usually in the legs, and those clots can break loose, lodge in the lungs, and block blood flow.  (Doc. 52 ¶ 32.)  Signs and symptoms of deep vein thrombosis and pulmonary embolism include "dehydration, severe pain in the right ankle. chest pain, rapid pulse, and fainting."  (*Id*.)

exemplary and punitive damages against Defendants Ingenesis, CoreCivic and Does 1-10, pre- and post-judgment interest, costs of, suit and attorneys' fees.[3]

## II.    Federal Rule of Civil Procedure 12(b)(6)

Dismissal of a complaint, or any claim within it, for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) may be based on either a "'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121–22 (9th Cir. 2008) (quoting *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir. 1990)).  In determining whether a complaint states a claim under this standard, the allegations in the complaint are taken as true and the pleadings are construed in the light most favorable to the nonmovant. *Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 900 (9th Cir. 2007).  A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  But "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what . . . the claim is and the grounds upon which it rests."  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (internal quotation omitted).  To survive a motion to dismiss, a complaint must state a claim that is "plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

As a general rule, when deciding a Rule 12(b)(6) motion, the court looks only to the face of the complaint and documents attached thereto.  *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990).  If a court considers evidence outside the pleading, it must convert the Rule 12(b)(6) motion into a Rule 56 motion for summary judgment.  *United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003).  A court may,

---

[3] Plaintiffs identify Does 1-10 as "corrections workers, medical services employees, CoreCivic personnel, and/or policymakers for CoreCivic."  (Doc. 52 ¶ 10.)

however, consider documents incorporated by reference in the complaint or matters of judicial notice without converting the motion to dismiss into a motion for summary judgment. *Id.*

**III.    Discussion**

CoreCivic argues in its Motion to Dismiss that Plaintiffs' allegations do not establish that CoreCivic was negligent and that any claims regarding medical negligence, negligent training, hiring and supervision and punitive damages should be dismissed.

**A.    Evidence Outside the Pleading**

With its Motion to Dismiss, CoreCivic provides a copy of the Inter-Governmental Service Agreement (IGSA) between ICE and the City of Eloy, Arizona, a 2007 modification to the IGSA, and a copy of the agreement between the City of Eloy and CoreCivic, which references the terms of the IGSA. (Doc. 54, Exs. A-C.) CoreCivic cites to these agreements and the provisions within them as to what entity was to provide medical care to detainees at EDC to argue that CoreCivic did not have a contractual duty to provide any medical care. (Doc. 54 at 3, 8.)

Plaintiffs respond that the Court should not consider those agreements because they were not attached to the FAC, were not necessarily relied on in the FAC, the documents are not self-authenticating, and Plaintiffs have not had an opportunity to take any discovery or test the veracity of their contents. (Doc. 55 at 8-9.) Plaintiffs assert that in identifying the parties and to give context to how Decedent ended up in a CoreCivic facility, the FAC references in paragraph 8 that CoreCivic had a contract to house immigrant detainees of the United States. (*Id.* at 8.) CoreCivic replies that the FAC actually mentions the "contract" between CoreCivic and the United States in paragraphs 7, 8, 56, 58 and 58(f) and that Plaintiffs are engaging in "stall tactics" on the issue of the authenticity of the documents "when the same have already been produced in discovery." (Doc. 63 at 2-3.) CoreCivic further argues that the IGSA and the 2007 modification are available to the public on the ICE website, which allows the Court to take judicial notice of those documents because they are public records. (*Id.* at 3.)

Paragraph 7 of the FAC alleges that the United States, through ICE, "contracts with private corporations and delegates government authority to those private contractors for custodial functions, including housing, of immigration detainees."

Paragraph 8 alleges that CoreCivic houses immigration detainees in the EDC "under a contract with ICE, which requires the facility to comply with the ICE Performance Based National Detention Standards (PBNDS) 2011."

Paragraph 56 alleges

> CoreCivic had the following duty by contract and United States Regulations: ICE PBNDS 2001 provides that, 'Every facility shall directly or contractually provide detainees population with the following; 2) Medically necessary and appropriate medical, dental and mental health care and pharmaceutical services; and 6) Timely responses to medical complaints.' CoreCivic breached this duty by failing to ensure that Decedent received or had access to any medical treatment or pharmaceutical services either directly or through contract and ignored her medical complaints during her entire period of detention at EDC.

Paragraph 58 alleges that "CoreCivic failed to take reasonable action to provide medical care to Decedent either directly or through contract, thereby breaching its duty to provide care to Decedent . . . ." Paragraph 58(f) alleges that among the acts and omissions of CoreCivic was "[t]he negligent failure to provide Decedent medication either directly or through contract[.]"

"A court may consider evidence on which the complaint ' necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006).

In this case, none of the FAC paragraphs cited by CoreCivic specifically reference the IGSA, the 2007 modification, or the agreement between the City of Eloy and CoreCivic. Paragraphs 7 and 8 of the FAC are obviously identifying why the United States and CoreCivic are Defendants in this action and their relationship through contract.

Paragraph 58 references a contract between CoreCivic and the United States as well as CoreCivic's obligations under the PBNDS 2001. Because the FAC does not refer to these specific agreements provided by CoreCivic and Plaintiffs questions the authenticity of the copies attached to CoreCivic's Motion, the Court may not consider the documents without converting the Motion to Dismiss to one for summary judgment. Moreover, it appears there may be some interplay between these contractual agreements and federal regulations that would require the Court to go beyond the pleadings and even the agreements submitted by CoreCivic in order to decide this Motion to Dismiss. Therefore, the Court will not consider the agreements CoreCivic has attached to its Motion to Dismiss.

### B.    Medical Negligence

CoreCivic argues that Plaintiff's negligence claim should be dismissed to the extent it alleges medical negligence because CoreCivic did not have a contractual duty to provide any medical care at EDC and Plaintiffs admit in the FAC that CoreCivic did not provide medical care at EDC. (Doc. 54 at 8, citing, in part, FAC ¶¶ 7, 9.) CoreCivic further argues that it cannot be held vicariously liable for the acts or omissions of any non-CoreCivic employee and that the ICE PBNDS "does not create liability on behalf of CoreCivic for the alleged inadequate provisions of medical services at EDC when it was absolved of this responsibility in 2007." (*Id*. at 9 and n.4.) CoreCivic also argues that "medical expert testimony is necessary under Arizona law to determine whether the alleged conduct fell below the standard of care in a medical malpractice action." (*Id*. at 10, citing Ariz. Rev. Stat. §§ 12-561(a), 12-563.) CoreCivic contends that Plaintiffs did not certify when they filed their Complaint whether expert opinion testimony was necessary to prove its liability, or provide a preliminary expert opinion affidavit, and therefore the FAC should be dismissed for lack of prosecution. (*Id*., citing, in part, Ariz. Rev. Stat. § 12-2603(A)-(B).)

Plaintiffs respond that they have not asserted a claim against CoreCivic as a health professional pursuant to Arizona Revised Statutes § 12-2603(A), which would require them to prove the health care professional's standard of care or liability for the claim. (Doc. 55 at 10.) Rather, they contend that "the gravamen of the allegations against CoreCivic

relates to its custodial denial of access to medical care" and, as such, they are not required to certify that expert testimony is necessary or serve a preliminary expert opinion affidavit. (*Id*.)  They argue that if CoreCivic is claiming that it is a health care professional under the statute then CoreCivic may seek an order from the court requiring Plaintiffs to obtain and service a preliminary expert opinion affidavit.  (*Id*., citing Ariz. Rev. Stat. § 12-2603(D).)

The FAC does not allege that CoreCivic is a health care provider such that the requirements of Arizona law relating to medical malpractice claims are implicated.  Nor does the FAC allege that CoreCivic failed to provide any specific medical care, but that CoreCivic failed to refer Decedent for medical treatment in a timely manner, failed to ensure she received her prescribed medications, and failed to ensure that she was appropriately housed for her medical status and conditions.   Therefore, CoreCivic's argument that any medical negligence claims should be dismissed are without merit.

### C.     Negligence

To state a claim for negligence under Arizona law, a plaintiff must allege facts supporting: (1) a duty on the part of the defendant to conform to a particular standard of care; (2) defendant's breach of that duty; (3) that the breach caused the resulting injury; and (4) actual damages. *Gipson v. Kasey*, 150 P.3d 228, 230 (Ariz. 2007).

Plaintiffs allege in Count Two that CoreCivic is vicariously liable for the acts and omissions of its employees, agents, and those subject to CoreCivic's control, that CoreCivic had a duty of care to Decedent while in CoreCivic's custody and by contract with the United States, and that CoreCivic breached its duty by failing to refer Decedent for medical treatment in a timely manner, thereby directly and proximately causing damages to Plaintiffs, and that but for CoreCivic's acts and omissions, Decedent would not have died.  (Doc. 52 ¶¶ 52-58.)  Plaintiffs specifically allege that CoreCivic's negligent acts included failing to ensure that a medical provider saw Decedent before she left the intake area after a RN designated Decedent as "priority one (PRI-1)"; failing to provide Decedent with a wheelchair, crutches, walker, or other ambulatory aid even after a housing unit officer observed her limping and she told him she had sprained her ankle; failing to

ensure Decedent's appointment with a medical provider was re-scheduled before transporting her out of quarantine housing; assigning her to an upper bunk; negligently documenting Decedent's whereabouts so that her prescribed medications never reached her; failing to provide Decedent's medications; failing to place Decedent's medical card in the pile with those of detainees still waiting to be seen by medical staff; failing to contact medical staff and return her to the clinic after Decedent informed an officer she had not been treated by medical staff and was still in pain; ignoring Decedent's repeated pleas for medical assistance and cries of pain; and by negligently hiring, training, and supervising CoreCivic employees who failed to follow CoreCivic policies and procedures and the laws and regulations of the United States. (*Id.* ¶ 58.)

CoreCivic argues that the allegations do not support the necessary elements of breach or causation because Decedent's injuries were not reasonably foreseeable to CoreCivic employees, who are all non-medical personnel. (Doc. 54 at 10.) CoreCivic contends that the FAC only alleges that Decedent complained of ankle pain and so "[t]here is no rational basis to infer that corrections personnel—not medical personnel—of ordinary intelligence should have been aware that the Decedent was suffering from, or could have died from a blood clot that allegedly caused deep vein thrombosis and a pulmonary embolism as a result of ankle pain." (*Id*. at 11.) CoreCivic also maintains that Plaintiffs have failed to establish causation or that Decedent's death would not have occurred but for the acts or omissions of CoreCivic employees. (*Id*. at 11-13.)

CoreCivic's arguments go more to the weight of the evidence rather than addressing whether Plaintiffs have sufficiently stated a negligence claim against CoreCivic. As to CoreCivic's specific argument that the allegations do not support the necessary elements of breach or causation, "breach and causation are ordinarily questions of fact for the jury to resolve." *Fehribach v. Smith*, 22 P.3d 508, 512 (Ariz. Ct. App. 2001). Accordingly, Plaintiffs have sufficiently stated a negligence claim against CoreCivic and the Court will deny the Motion to Dismiss on this basis.

. . . .

**D.     Negligent Hiring, Training, and Supervision**

"An employer is liable for the tortious conduct of its employee if the employer was negligent or reckless in hiring, supervising, or otherwise training the employee." *Joseph v. Dillard's, Inc.*, No. CV-08-1478-PHX-NVW, 2009 WL 5185393, at \*18 (D. Ariz. Dec. 24, 2009) (noting that Arizona follows the Restatement (Second) Agency with regard to negligent hiring and supervision).  "For an employer to be liable for negligent hiring, retention, or supervision of an employee, a court must first find that the employee committed a tort."  *Kuehn v. Stanley*, 91 P.3d 346, 352 (Ariz. Ct. App. 2004) (citing *Mulhern v. City of Scottsdale*, 799 P.2d 15, 18 (Ariz. Ct. App. 1990)).

CoreCivic argues that the FAC "is void of any allegation or evidence showing what training should have been provided to CoreCivic personnel and/or how this omission proximately caused the decedent's death."  (Doc. 54 at 14.)  CoreCivic also argues that Plaintiffs have failed to state a plausible claim that any CoreCivic employee committed a tort that proximately caused the decedent's death . . . ."  (*Id.* at 15.)

Plaintiffs respond that the following allegations support their negligent hiring, training and supervision claims:

- CoreCivic "had the legal duty to oversee and supervise the hiring, conduct and employment of each and every CoreCivic defendant" (Doc. 52 ¶ 12);

- "By failing to discipline, retrain, or terminate any of the involved . . . CoreCivic staff, Defendants . . . and CoreCivic also ratified the failure to medically evaluate and treat Decedent causing her to suffer injuries and death." (*Id.* ¶ 42);

- "CoreCivic also knew or should have known that the failure to medically assess, care, and treat Decedent in this case was illegal and violated United States policy, but [] failed to discipline, terminate, or retrain the employees responsible. In so failing to act, . . . CoreCivic ratified their employees' illegal and improper conduct in medically neglecting Decedent."  (*Id.* ¶ 43);

- "CoreCivic "knew or should have known that their employees have, or had at the time of this incident, inadequate training regarding persons who are in need of medical care, and/or experiencing a medical emergency" and "failed to take measures to ensure that [EDC] medical or custodial staff were adequately trained on the medical care and treatment of detainees."  (*Id.* ¶ 44);

- CoreCivic "failed to properly train [EDC] staff on . . . CoreCivic policies and the law, with respect to providing medical care to detainees, detainees' rights to medical care, and documenting medical care for inmates housed in the cells." (*Id.* ¶ 45); and

- "The negligent hiring, training and supervision of CoreCivic employees who failed to follow CoreCivic policies and procedures as well as the laws and regulations of the United States." (*Id.* ¶ 58(j).)

The Court has already determined that Plaintiffs have sufficiently alleged a negligence claim, i.e., a tort committed by a CoreCivic employee for which CoreCivic is vicariously liable. At this stage of the proceedings, Plaintiffs have also sufficiently alleged claims of negligent hiring, training and supervision where they allege, for example, that that CoreCivic employees received inadequate training "regarding persons who are in need of medical care, and/or experiencing a medical emergency," which led to Decedent's injuries and death, and that CoreCivic failed to retrain, discipline or terminate employees who were involved in Decedent's death. Plaintiffs have also alleged specific instances of CoreCivic officers' negligent actions such as moving Decedent to a general population unit before she saw a provider, assigning Decedent an upper bunk, misplacing Decedent's ID card so that she was sent back to her unit without seeing a provider, and not contacting medical after Decedent reported that she did not receive medical treatment and complained of tremendous pain. From these allegations, it is plausible that the actions or inactions of CoreCivic employees were due to negligent hiring, training or supervision, and these allegations are sufficient to give CoreCivic fair notice of what Plaintiffs' claims are and the grounds upon which they rest. *Erickson*, 551 U.S. at 93.

The Arizona cases cited by CoreCivic almost uniformly address a plaintiff's burden at summary judgment in negligent hiring, training and supervision claims.[4]  Unlike a

---

[4] *See* Doc. 54 at 13-16, citing *Guerra v. State*, 323 P.3d 765, 772 (Ariz. Ct. App. 2014) (appeal of grant of summary judgment to the defendant); *Kuehn v. Stanley*, 91 P3.d 346, 352 (Ariz. Ct. App. 2004) (appeal from grant of mortgagee's motions for summary judgment); *Humana Hosp. Desert Valley v. Superior Court*, 742 P.2d 1382, 1382 (Ariz. Ct. App. 1987) (special action requesting review of trial court's denial of a motion to quash discovery); *Quinonez v. Andersen*, 696 P.2d 1342 (Ariz. Ct. App. 1984) (appeal from judgment in favor of statutory beneficiaries regarding adequacy of awards); and *Tucson*

motion to dismiss, the legal standard to survive a motion for summary judgment requires *evidence* to support a claim, and thus is a higher standard than that required to survive a motion to dismiss.  *See* Fed. R. Civ. P. 56; *In re Oracle Corp. Sec. Litig*., 627 F.3d 376, 387 (9th Cir. 2010) (discussing summary judgment standard, which requires that the nonmovant "come forth with evidence").

Accordingly, the Court will deny CoreCivic's Motion to Dismiss Plaintiffs' negligent hiring, training or supervision claims.

### E. Punitive Damages

To support a claim for punitive damages under state law, "there must be 'something more' than gross negligence; the 'something more' is an 'evil mind.'" *In re Estate of Fazio*, No. 1 CA-CV 07-0520, 2009 WL 1830719, at *3 (Ariz. Ct. App. June 25, 2009) (quoting *Volz v. Coleman Co., Inc.*, 748 P.2d 1191, 1194 (Ariz. 1987)).  But "evil mind" can be inferred from a defendant's deliberate indifference to the rights of others or conscious disregard of an "unjustifiably substantial risk of significant harm." *Id.* (quoting *Linthicum v. Nationwide Life Ins. Co.*, 723 P.2d 675, 680 (Ariz. 1986)).  A jury may assess punitive damages if it finds that a defendant consciously disregarded a known substantial risk that their conduct might significantly injure another or that a defendant's conduct was outrageous in nature.  *Bradshaw v. State Farm Mut. Auto. Ins. Co.*, 758 P.2d 1313, 1324 (Ariz. 1988).

CoreCivic argues that the FAC is void of allegations that any CoreCivic employee acted with evil motive or intent as required to support a punitive damages claim and "because Plaintiffs have failed to state any direct claims against CoreCivic, Plaintiff's punitive damages claim should be dismissed against CoreCivic directly."  (Doc. 54 at 16.)

CoreCivic's motion to dismiss Plaintiffs' request for punitive damages is premature because at this stage of the proceedings there is no evidence before the Court to determine

---

*Med. Ctr., Inc. v. Misevch*, 545 P.2d 958 (Ariz. 1976) (special action to compel hospital to produce documents).

whether a reasonable jury could conclude that CoreCivic exhibited reckless or callous indifference to Plaintiff' s rights.  Accordingly, the Court will deny CoreCivic's Motion to Dismiss Plaintiffs' plea for punitive damages.

**IT IS ORDERED:**

(1)    The reference to the Magistrate Judge is **withdrawn** as to Defendant CoreCivic's Motion to Dismiss (Doc. 54), and the Motion is **denied**.

(2)    All other matters must remain with the Magistrate Judge for disposition as appropriate.

Dated this 15th day of September, 2020.

Honorable Roslyn O. Silver
Senior United States District Judge

- 14 -