# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mario Rene Hidalgo Lopez; B.H.; and L.H., minors, by and through their guardian ad litem, Mario Rene Hidalgo Lopez, individually and successors-in-interest to decedent Raquel Evangelina Calderon de Hidalgo, <br><br>Plaintiffs,<br><br>v.<br><br>CoreCivic, United States of America, InGenesis Incorporated,<br><br>Defendants. | No. CV 19-04332 PHX ROS (CDB) <br><br> **ORDER** |

Defendant CoreCivic ("CoreCivic") and Plaintiffs notified the Magistrate Judge via email that there is a dispute regarding discovery, and were ordered to plead their arguments regarding the disputes. (ECF No. 105). CoreCivic contends Plaintiffs have failed to adequately respond to propounded interrogatories and requests for production.

## I.    Background

At the time of her death on November 27, 2016, Raquel Calderon de Hidalgo ("Decedent"), a native of Guatemala, was an ICE detainee housed at the Eloy Detention Center ("EDC"), a facility owned and operated by CoreCivic. ICE Health Services Corps ("IHSC") provides medical services at EDC. IHSC contracted with Defendant InGenesis, Inc. ("InGenesis"), to provide medical staffing at EDC.

On or about November 17, 2016, Decedent, who was then 36 years of age, was arrested near Robles Junction, Arizona, by the United States Border Patrol. (ECF No. 52 at 5). Plaintiffs allege that, after complaining of "severe pain" for three days to Border Patrol agents, on November 20, 2016 Decedent was sent to the emergency department at Banner University Medical Center, where she was diagnosed with an ankle sprain, soft tissue injury of her right knee and ankle, and a headache due to trauma. (*Id.*). She was prescribed ibuprofen and ordered to follow up with a primary care provider. (ECF No. 52 at 6). On November 23, 2016 Decedent was placed in ICE custody and transferred to EDC, where she was assessed by medical personnel during the facility's intake process. (*Id.*). From November 23 to November 27, 2016, Decedent had face-to-face interactions with medical providers on at least four separate occasions. (ECF No. 52 at 6-8). On November 26, 2016 Decedent went to the EDC medical unit because she was in pain. Bradford, a registered nurse, checked her vitals and noticed she had a high pulse (120 beats per minute) and low oxygen saturation level, and Decedent reported her pain level as a nine out of ten. (ECF No. 52 at 8). RN Bradford subsequently notified an InGenesis nurse practitioner, Montenegro, that Decedent needed to see a health care provider. (*Id.*). Decedent was never seen by a provider. (*Id.*). Upon returning to her housing unit, Decedent reported to her housing unit officer that she did not receive treatment and was still in tremendous pain. (*Id.*). The housing unit officer, Villalobos, reported to the Desk Officer, Archiniega, that Decedent was crying and complaining of pain, and Officer Archiniega agreed to contact medical. However, Officer Archiniega never contacted medical. (*Id.*).

Plaintiffs allege that on November 27, 2016, approximately eighteen hours after the interaction between Villalobos and Archiniega, Decedent was ordered by CoreCivic employees to walk outside for recreation call. (*Id.*). Decedent collapsed while in the yard and experienced a seizure. (*Id.*). Plaintiffs assert:

> . . . Four minutes later, at 9:28 a.m., INGENESIS NP Montenegro, followed by RN Kwenoze Forlemu and LNP Tyler McHugh, both from INGENESIS, arrived on the scene and took DECEDENT's vitals, which showed a pulse of 130 beats per minute and a low oxygen saturation level of

95%. At 9:34 a.m., six minutes after DECEDENT's vitals were taken, EDC central control called 911. At 9:39 a.m., fifteen minutes after DECEDENT's seizure, the nurses and Officer Ferraro took DECEDENT to the medical unit. DECEDENT had a second seizure while being transported to the medical unit. When DECEDENT and the nurses finally arrived at the medical unit, DECEDENT was put on oxygen. Her vitals at this time showed her oxygen saturation level was 76%. Sometime between 9:45 a.m. and 9:50 a.m., Eloy Fire District arrived and assumed care of DECEDENT. She was transported to Banner Casa Grande Medical Center's emergency department.

28. DECEDENT arrived at Banner Casa Grande Medical Center at 10:20 a.m. Over the course of the next fifty-seven minutes, DECEDENT coded and was resuscitated three times. At 11:17 a.m., DECEDENT was pronounced dead.

29. An autopsy was performed. DECEDENT's death certificate listed her immediate cause of death as Pulmonary Embolism due to, or as a consequence of, deep vein thrombosis.

(ECF No. 52 at 9).

Plaintiffs are Decedent's husband, Mario Hidalgo Lopez, who sues individually and as guardian ad litem of Decedent's children L.H. and B.H., and Luisa Calderon ("L.H."), who was a minor at the time the suit was initiated, and B.H., a minor. Mr. Hidalgo Lopez currently resides in the United States, and Ms. Calderon and B.H. live in Guatemala. Although Ms. Calderon was a minor at the time the Complaint was filed, she has since reached the age of majority. The case was initially filed as one seeking relief pursuant to 28 U.S.C. § 1983. In the operative Fourth Amended Complaint Plaintiffs state causes of action for medical negligence resulting in death against the United States pursuant to the Federal Tort Claims Act, and for wrongful death arising from medical negligence against CoreCivic and InGenesis. (ECF No. 52).

Plaintiffs contend that CoreCivic's employee security guards negligently failed to provide access to medical treatment and that their supervisor had literally forgotten about decedent until she had died. Specifically, Plaintiffs allege in the Fourth Amended Complaint [] that CoreCivic failed to refer Decedent for medical treatment in a timely manner, failed to ensure she received her prescribed medications, and failed to ensure that she was appropriately housed for her medical status and conditions. As a result of CoreCivic's negligent failures to provide access to medical care, Decedent

died from a pulmonary embolism as a result an untreated deep vein thrombosis.

(ECF No. 106 at 2). Per the operative complaint, Plaintiffs seeks compensatory damages "including both survival damages and wrongful death damages under federal and state law, in an amount to be proven at trial;" damages for "loss of financial support;" "funeral and burial expenses;" exemplary and punitive damages against InGenesis and CoreCivic; and costs and attorneys' fees. (ECF No. 52 at 24).[1] In response to the United States' interrogatory, Plaintiffs stated:

> Plaintiffs seek wrongful death damages and survival damages under federal and state law. Plaintiffs also seek punitive damages against the business entity defendants and individual defendants.
> **Survival Damages**
> Raquel Calderon de Hidalgo's survival damages for her loss of life and for her pre-death pain and suffering:
> Loss of life:                            $5,000,000
> Pre-death pain and suffering:      $2,500,000
>          Plaintiff's wrongful death damages for their past and future loss of Raquel Calderon de Hidalgo's love, companionship, comfort, care, training, education, protection, affection, society, and moral support.
> Mario Hidalgo Lopez:               $5,000,000
> LH:                                         $5,000,000
> BH:                                         $5,000,000
> **Punitive Damages**
>          Plaintiffs seek punitive damages in an amount to be proven at trial from each of the Corporate and individual defendants but not USA. Plaintiffs also seek interest and other costs associated with the litigation.

(ECF No. 108-1 at 13).

The deadline for submitting requests for written discovery has expired; the deadline for deposing fact witnesses is August 25, 2021; and all expert witness depositions must be completed by December 3, 2021.

In the email to chambers notifying the Magistrate Judge of the discovery dispute, counsel for CoreCivic framed the issues as follows:

---

[1] In the initial complaint Plaintiff sought compensatory damages, including both survival damages (pre-death pain and suffering and loss of life and loss of enjoyment of life); wrongful death damages; loss of financial support; funeral and burial expenses; and attorneys' fees and costs.

Plaintiffs and Defendant CoreCivic dispute the relevance, proportionality, scope, and privacy considerations with respect to the production of compressed files containing all of Plaintiffs' and the decedent's downloadable Facebook history, posts, communications, and content. These parties also dispute whether Plaintiffs' prior Facebook accounts, including the decedent's, are accessible.

In addition, Plaintiffs Luisa Calderon and Mario Hidalgo-Lopez testified at their depositions that they frequently communicated with the decedent and each other during the relevant timeframe to the present using Facebook Messenger and WhatsApp, a free messaging platform. Plaintiffs and Defendant CoreCivic dispute the relevance, scope, proportionality, and privacy considerations associated with the production of these communications. Plaintiffs additionally contend they do not possess these communications, or any other responsive content aside from approximately four Facebook posts relating to the decedent's death, which they intend to produce, because they no longer have access to their prior accounts and no longer have any messages related to decedent Raquel Calderon de Hidalgo. Defendant CoreCivic disputes this contention, and seeks the production of the above-mentioned Facebook information, and all WhatsApp messages and data to determine whether the same exists and is relevant to Plaintiffs' liability and damages claims.

Next, Plaintiffs and Defendant CoreCivic dispute discoverable information relevant to emotional distress damages.

## II. Governing Law

Federal Rule of Civil Procedure 26(b)(1) provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . ." Fed. R. Civ. P. 26(b)(1). Relevance is construed broadly to encompass any matter that could reasonably affect the outcome of the case. *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). Additionally, "[i]nformation within this scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1).

However, even relevant discovery may be limited if

(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the

> importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

Fed. R. Civ. P. 26(b)(2)(C).

"Broad discretion is vested in the trial court to permit or deny discovery, and its decision to deny discovery will not be disturbed except upon the clearest showing that denial of discovery results in actual and substantial prejudice to the complaining litigant." *Hallet v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002). When "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issue," a motion to compel may be denied. *See* Fed. R. Civ. P. 26(b)(2)(C)(iii). Declining to compel the disclosure of information which is only minimally relevant to a claim is not an abuse of discretion. *Hallet*, 296 F.3d at 751.

Pursuant to Rule 37(a)(2)(3) of the Federal Rules of Civil Procedure, a party propounding discovery may seek an order compelling disclosure when an opposing party has failed to respond or has provided evasive or incomplete responses. Pursuant to Rule 33(a)(2) of the Federal Rules of Civil Procedure, an interrogatory may relate to any matter that may be inquired into under Rule 26(b). Additionally, Rule 34 of the Federal Rules of Civil Procedure provides, in part, that

> [a]ny party may serve on any other party a request (1) to produce and permit the party making the request, or someone acting on the requestor's behalf, to inspect and copy, any designated documents . . . within the scope of Rule 26(b)6 and which are in the possession, custody or control of the party upon whom the request is served. . . .

Rule 34 has been liberally construed to facilitate the discovery process. However, "the breadth of Rule 34 of course does not mean that every document is ipso facto discoverable." 8B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil § 2206 (3d ed.). Accordingly, production may only be required if the

documents are in the possession, custody or control of the party upon whom the request was served.

"[A] party need not have actual possession of documents to be deemed in control of them." *In re Folding Carton Antitrust Litig.*, 76 F.R.D. 420, 423 (N.D. Ill. 1977). Generally, a party is deemed to have control of documents if the party has the legal right to obtain the requested documents upon demand. *See*, *e.g.*, *United States v. International Union of Petroleum & Indus. Workers, AFL-CIO*, 870 F.2d 1450, 1452 (9th Cir. 1989); *Searock v. Stripling*, 736 F.2d 650, 653 (11th Cir. 1984). The relationship between the party and the person or entity having actual possession of the document is central to this issue. The party from whom the discovery is sought must be able to command release of the documents by the person or entity in actual possession to be deemed in "control" of the information. *E.g.*, *Estate of Young Through Young v. Holmes*, 134 F.R.D. 291, 293-94 (D. Nev. 1991). "The party seeking production of the documents [] bears the burden of proving that the opposing party has such control." *International Union of Petroleum & Indus. Workers*, 870 F.2d at 1452. *See also Isola USA Corp. v. Taiwan Union Tech. Corp.*, 2015 WL 12592702, at *2 (D. Ariz. Apr. 6, 2015).

### III.    Statement of Disputes

The Court ordered Defendant CoreCivic and Plaintiffs to submit pleadings on the dispute to the Court. (ECF No. 105). Plaintiffs' pleading regarding the discovery dispute is at ECF Nos. 106 and 107; CoreCivic's pleading on the dispute is at ECF No. 108. The Court will construe the pleading at ECF No. 108 as a motion to compel brought by CoreCivic, and the pleading at ECF No. 106 as Plaintiffs' response to the motion to compel.

In its pleading at ECF No. 108, CoreCivic indicates the dispute is with regard to Plaintiffs' responses to CoreCivic's First Set of Interrogatories and Requests for Production to Plaintiff, served November 20, 2020. (ECF No. 72). Per the pleading at ECF No. 108, the following requests for discovery are at issue:

**A.    Interrogatories**

**1.    Interrogatory No. 7**

CoreCivic's Interrogatory No. 7 is as follows:

Fully identify any and all user names and email address(es) associated with each account and the approximate date of membership for any and all social media platforms Plaintiffs and decedent maintain(ed), including but not limited to, Facebook, Instagram, MySpace, YouTube, Google+, OnlyFans, Twitter, and/or any other personal interaction/friendship, business, dating, photo/video sharing, blog, entertainment and/or communication social media platform. Furthermore, pursuant to Fed. R. Civ. P. 26, 34, and your obligation to preserve all electronically stored information, you are hereby requested to preserve, as is, all information contained within your social media internet accounts and profiles, and not to change or make additions or deletions to the same. If the profiles and/or content no longer exist, identify the date it was disabled/deleted, why and at the direction of whom.

(ECF No. 107-1 at 3) (emphasis added).

In response to Interrogatory No. 7, Plaintiffs stated: "L.H. has a facebook account in the name of Luisa Calderon. Mario Hidalgo has a facebook account in the name of Mario Hidalgo. Decedent had a facebook account in the name of Raquel Calderon. Discovery is continuing and Plaintiffs reserve the right to supplement this response." (ECF No. 107-2 at 3; ECF No. 108-1 at 5). Plaintiffs later supplemented their response as follows:

L.H. has a facebook account in the name of Luisa Calderon. Her user name is her name. The e-mail address associated with the account is: Hidalgoluisa260@gmail.com.

Mario Hidalgo has a Facebook account in the name of Mario Hidalgo. His user name is his name. He has no e-mail address and therefore, there is no email address associated with his Facebook account. His Facebook account is associated with the telephone number (805) 908-5422.

Decedent had a Facebook account in the name of Raquel Calderon. Plaintiffs do not know what the login information is associated with the account.

Plaintiffs are unaware of the dates of membership associated with the accounts. Plaintiffs do not have other social media accounts held by plaintiffs or Decedent. Discovery is continuing and Plaintiffs reserve the right to supplement this response.

(ECF No. 107-3 at 4).

**2.      Interrogatory No. 10**

CoreCivic's Interrogatory No. 10 is as follows:

Provide the names, addresses and phone numbers of any and all individuals Plaintiffs discussed the incident with, whether in person or otherwise (e-mail, instant messaging, text, blog, Facebook, Twitter, etc.), including the mode, date and content of the discussion, and whether such content still exists or has been deleted its submission (and, if deleted, why and at the direction of whom).

(ECF No. 108-1 at 7).

In response to Interrogatory No. 10, Plaintiffs stated:

Plaintiffs only spoke with each other within the family regarding the incident. Plaintiffs spoke to Grandmother Matilde Calderon and Aunt Amelia Calderon, Barrio San Sebastian Zona 1, San Juan Ostuncalco, Queztzaltenango, Guatemala. Plaintiff spoke with Mayor Juan Aguilar, Alcaldia De San Juan Ostuncalco, Zona 1, San Juan Ostuncalco, Quetzaltenango, Guatemala. Plaintiffs spoke with an unknown person from the Guatemalan Consulate.

(*Id.*).

Plaintiffs' supplemental response to this interrogatory states:

Following Decedent's death, Plaintiffs orally spoke with each other within the family regarding the incident. Plaintiffs spoke to Grandmother Matilde Calderon and Aunt Amelia Calderon. Grandmother Matilde Calderon and Aunt Amelia Calderon reside at Barrio San Sebastian Zona 1, San Juan Ostuncalco, Queztzaltenango, Guatemala. Plaintiffs spoke to Grandmother Matilde and Aunt Amelia shortly after Decedent's death. Grandmother Matilde does not have a phone number. Aunt Amelia's phone number is 502-35878650.
Plaintiff spoke with Mayor Juan Aguilar. He is located at Alcaldía De San Juan Ostuncalco, Zona 1, San Juan Ostuncalco, Quetzaltenango, Guatemala. His phone number is unknown. However, the mayor's office likely has a phone number available to the public.
Plaintiffs spoke with a person named Carlos Leon Guatemalan Consulate in Arizona. Plaintiffs are unaware of Mr. Leon's telephone number at this time. However, the contact information for the Guatemalan Consulate in Arizona is 55 E Thomas Rd 3rd Floor, Suite 300, Phoenix, AZ 85012, Phone: (844) 805-1011. They would likely know what Mr. Leon's contact information is.

(ECF No. 108-1 at 24).

CoreCivic states it asserted a deficiency in Plaintiffs' response in an email of March 23, 2021. (ECF No. 108 at 6). However, they do not discuss in the rest of their pleading this specific interrogatory and the content of the email of March 23, 2021 is not provided in the pleading. The Court will presume, therefore, that the alleged deficiency is Plaintiffs' failure to provide CoreCivic with the entirety of their Facebook posts and messages and WhatsApp messages, which could be construed to reveal the identity of all persons "Plaintiffs discussed the incident with . . . or otherwise, . . . Facebook, Twitter, etc.)." Because the interrogatory specifies information with regard to whom Plaintiffs discussed the "incident," with, it would appear to be limited to the time period subsequent to November 27, 2016.

**B.     Requests for Production**

CoreCivic asserts the following Requests for Production of Documents are at issue:

**1.     Request for Production No. 3**

CoreCivic's Request for Production No. 3 is as follows:

Produce a compressed file containing the entire history of any social media profiles maintained by you including, but not limited to, blogs, Facebook, Twitter, MySpace, Instagram, SnapChat, Only Fans and/or any other social media/media sharing platform the Plaintiffs or decedent maintained as identified by Plaintiffs in response to Interrogatory Number 7, served simultaneously with these requests, by downloading all content including photos, ads, timelines, walls, and information from your user and account history. For Facebook data please utilize "Facebook's Download Your Information" tool and produce all associated information with metadata. Furthermore, pursuant to Fed. R. Civ. P. 26, 34, and your obligation to preserve all electronically stored information, you are hereby requested to preserve, as is, all information contained within your social media internet accounts and profiles, and not to change or make additions or deletions to the same. If the profiles no longer exist, identify the date it was disabled/deleted, why and at the direction of whom.

(ECF No. 107-4 at 3).

Plaintiffs' Response to Request No. 3 is as follows:

Objection, this interrogatory is not proportionate to the needs of the case. The compressed file of a Plaintiffs Facebook account is not necessary to determine whether Defendants failed to provide appropriate access to

medical care of decedent, Raquel Calderon de Hidalgo. Plaintiffs further object on the basis that this request is an invasion of privacy and overly broad. Defendant CoreCivic requests content available for public view and also material that is restricted from public view and not in the possession of Plaintiffs.

Plaintiffs need not produce documents from third parties if compulsory process against those parties is available to party seeking documents. Plaintiffs are not in "control" of the records requested by defendant CoreCivic and CoreCivic has equal ability to obtain from public sources. [See *Estate of Young Through Young v. Homes* (D NV 1991) 134 FRD 291, 294]. Plaintiffs understand that Facebook contains the documents defendant has requested. Facebook's address is 1 Hacker Way, Menlo Park, CA. Plaintiffs reserve the right to supplement this response.

(ECF No. 107-5 at 4).[2]

Plaintiffs further responded to this request:

Objection, this interrogatory is not proportionate to the needs of the case. The compressed file of a Plaintiffs Facebook account is not necessary to determine whether Defendants failed to provide appropriate access to medical care of decedent, Raquel Calderon de Hidalgo. Plaintiffs further object on the basis that this request is an invasion of privacy and overly broad. Defendant CoreCivic requests content available for public view and also material that is restricted from public view and not in the possession of Plaintiffs.

Plaintiffs need not produce documents from third parties if compulsory process against those parties is available to party seeking documents. Plaintiffs are not in "control" of the records requested by defendant CoreCivic and CoreCivic has equal ability to obtain from public sources. [See Estate of Young Through Young v. Holmes (D NV 1991) 134 FRD 291, 294]. Plaintiffs understand that Facebook contains the documents

---

[2] In *Estate of Young Through Young v. Holmes*, a sportswriter brought an action against a sports figure who owned a boxing practice arena, to recover damages allegedly sustained when the sportswriter was physically removed from the arena. Upon the sportswriter's death, his estate was substituted as the party in interest. The defendant filed a motion to compel production of materials written by the sportswriter that mentioned or referred to the sports figure and all of the medical records, documents, bills, and notes for the treatment of the injuries proximately caused by alleged incident. The court held that the sportswriter's articles, which were sold to a newspaper, were not within the control of the estate and could not be ordered produced from the estate. The court also held the sports figure was not entitled to production of medical documents which apparently did not exist, and whose absence could ultimately work to the defendant's advantage. *See* 134 F.R.D. 291 (D. Nev. 1991).

Defendant has requested. Facebook's address is 1 Hacker Way, Menlo Park, CA.

**Plaintiffs do not have access to decedent's facebook account**. Plaintiffs reserve the right to supplement this response.

(ECF No. 107-6 at 4) (emphasis in original).

Plaintiffs further updated their response as follows:

Objection, this request is not proportionate to the needs of the case. This request is not relevant to any claim or defense. The compressed file of a Plaintiffs Facebook account is not necessary to determine whether Defendants failed to provide appropriate access to medical care of decedent, Raquel Calderon de Hidalgo or whether Plaintiffs suffered garden variety emotional distress as alleged in the operative Complaint. Plaintiffs further object on the basis that this request is an invasion of privacy and overly broad because there are no restrictions as to time or content. Defendant CoreCivic requests content available for public view and also material that is restricted from public view and not in the possession of Plaintiffs and unrelated to this matter. In addition, this request seeks content from L.H. while she was under the age of 18.

Plaintiffs need not produce documents from third parties if compulsory process against those parties is available to party seeking documents. Plaintiffs are not in "control" of the records requested by defendant CoreCivic and CoreCivic has equal ability to obtain from public sources. [See *Estate of Young Through Young v. Holmes* (D NV 1991) 134 FRD 291, 294]. Further, basic account information is available through Facebook or by Defendant performing a public search independently.

Without waiving said objections, Plaintiffs respond: **Plaintiffs identified three accounts in response to Defendant's Interrogatory Number 7. (1) Raquel Calderon de Hidalgo's account that was maintained by her, and her alone, (2) L.H.'s Facebook account in the name of Luisa Calderon, and (3) Mario Hidalgo's Facebook account in the name of Mario Hidalgo.**

**Plaintiffs have performed a reasonable and diligent search for the requested content and are unable to produce content related to Decedent's Facebook account(s) because Plaintiffs do not now and have never maintained Decedent's Facebook account(s) and do not have access to any of Decedent's accounts. Further, Raquel Calderon de Hidalgo's Facebook account was not maintained by Plaintiffs and was not identified as maintained by Plaintiffs in response to Defendant's Interrogatory Number 7. Plaintiffs do not have knowledge of Decedent's log-in information, e-mail, or phone number used to log in to Facebook and therefore it is impossible to access or retrieve the account. The**

**accounts were never maintained by Plaintiffs and are therefore impossible for them to access. However, Plaintiffs believe that Decedent's Facebook information is available through Facebook, located at: 1 Hacker Way, Menlo Park, CA.**

Plaintiff, L.H. has performed a reasonable and diligent search for content related to her two previous Facebook accounts and is unable to produce any documents responsive to this request because she does not maintain these accounts. Plaintiff, L.H's two previous Facebook accounts were not identified as maintained by Plaintiffs in response to Defendant's Interrogatory Number 7.

As testified in her deposition: (1) the Facebook account she used to communicate with her mother in 2016 was hacked and therefore she it is impossible to access that account and, (2) she does not recall the log in information, e-mail or phone number she may have used for her other account, so it is impossible to access that account. As such, L.H.'s prior accounts are no longer maintained by Plaintiff.

**As to Plaintiff's currently maintained account, identified in response to Defendant's Interrogatory Number 7, in the name of Luisa Calderon, date of registration May 19, 2018, Plaintiff has performed a reasonable and diligent search of her Facebook account and produces the following posts and associated comments related to Raquel Calderon de Hidalgo attached hereto as PLAINTIFFS 000454 to 000459.**

**As to Plaintiff, L.H.'s Whatsapp, Plaintiff has performed a reasonable and diligent search and is unable to produce content requested because she does not maintain the devices used to message her mother prior to her mother's death in 2016. Plaintiff L.H. was 15 years old at the time of her mother's death. Plaintiff has performed a reasonable and diligent search of her currently maintained Whatsapp and she has no messages to, from, or related to Raquel Hidalgo de Calderon or any Defendants and is therefore unable to produce content requested, because it does not exist.**

**Plaintiff Mario Hidalgo Lopez has performed a reasonable and diligent search for content related to his previous Facebook account and it is impossible to regain entry to that account because he does not maintain it. Plaintiff, Mario Hidalgo's previous Facebook account was not identified as maintained by Plaintiffs in response to Defendant's Interrogatory Number 7. Plaintiff does not have access to the email address or any credentials used to set up that Facebook account. Plaintiff's prior account is not maintained by him and therefore he has no access to it. However, without waiving objections, and in the spirit of discovery, through a public search of his name Plaintiffs have located his public profile and found posts related to Raquel Calderon de Hidalgo attached hereto as PLAINTIFFS 000460 to 000467. By producing these**

**unmaintained posts or messages Plaintiff Mario Hidalgo Lopez is not asserting that he maintains this profile.**

**As to Plaintiff's currently maintained account in the name of Mario Hidalgo, date of registration August 21, 2020, Plaintiff has performed a reasonable and diligent search of his Facebook account and he has no posts, messages, or data related to Raquel Calderon de Hidalgo or Defendants. As to Plaintiff Mario Hidalgo Lopez's currently maintained Whatsapp, he has performed a reasonable and diligent search of the requested content and is unable to produce any requested content, because it has never existed in his currently maintained Whatsapp account. Plaintiff is unable to produce any requested content regarding communications to or from Raquel Calderon de Hidalgo, or about Raquel Calderon de Hidalgo from his phone used at the time of her death because he no longer maintains the phone number or phone used at the time of the incident. He changed devices and numbers several times prior to this litigation commencing. He also has no Whatsapp communications about Defendants.**

**Plaintiffs refuse to produc[e] any content that is maintained by minor Plaintiff B.H.**

(ECF No. 107-8 at 4-7) (some emphasis removed).

### 2.    Request for Production No. 8

CoreCivic's Request for Production No. 8 is as follows

Produce all electronically stored information ("ESI") such as e-mails, correspondence or word processed documents, photographs, image and facsimile files, sound recordings, video and animation, conversation/statements, text messages, Facebook messages, social platform messages and/or any other ESI and/or documents prepared, received, created, viewed or maintained by Plaintiffs pertaining to the incident, this lawsuit, or the pursuit of a potential claim against any entity or person arising out of the decedent's death, from November 26, 2016 to the present. This production should be in native format.

(ECF No. 107-4 at 4).

Plaintiff's first response to this request is as follows:

Objection, this interrogatory is not proportionate to the needs of the case. The compressed file of a Plaintiffs Facebook account is not necessary to determine whether Defendants failed to provide appropriate access to medical care of decedent, Raquel Calderon de Hidalgo. Plaintiffs further object on the basis that this request is an invasion of privacy and overly broad. Defendant CoreCivic requests content available for public view and

- 14 -

also material that is restricted from public view and not in the possession of Plaintiffs.

Plaintiffs need not produce documents from third parties if compulsory process against those parties is available to party seeking documents. Plaintiffs are not in "control" of the records requested by defendant CoreCivic and CoreCivic has equal ability to obtain from public sources. [See Estate of Young Through Young v. Holmes (D NV 1991) 134 FRD 291, 294]. Without waiving said objections, Plaintiffs respond: Please see Plaintiffs' exhibits 1-7 to Plaintiffs' MIDP responses and exhibit 8 attached herein. . . .

(ECF No. 107-5 at 5-6).

Plaintiffs' second response to this request is as follows:

**Objection, this interrogatory is not proportionate to the needs of the case. Without waiving said objection, Plaintiffs respond: Plaintiffs do not have electronically stored information ("ESI") such as e-mails, correspondence or word processed documents, photographs, image and facsimile files, sound recordings, video and animation, conversations/statements, text messages, Facebook messages, social platform messages and/or any other ESI and/or documents prepared, received, created, viewed or maintained by Plaintiffs pertaining to the incident, this lawsuit, or the pursuit of a potential claim against any entity or person arising out of the decedent's death, from November 26, 2016 to the present.**

(ECF No. 107-8 at 9) (emphasis in original).

Following this document in the record are what appear to be social media posts from Ms. Calderon, which are not translated into English, showing pictures of her with her mother accompanied by crying, sobbing, and broken-heart emojis, with many comments, some by her father. (ECF No.107-8 at 10-14). Also attached are pages from Mr. Hidalgo-Lopez's Facebook account, including photos, his friends list, and posts from December 17, 2017, including what appear to be pictures of Decedent. (ECF No. 107-8 at 15-22).

Mr. Hidalgo Lopez and Ms. Calderon were deposed in May of 2021. CoreCivic represents their deposition testimony as follows:

At her deposition, Luisa testified that she has two Facebook accounts under the names Luisa Hidalgo and Luisa Calderon. []. She stated that she used the Luisa Hidalgo account in 2016, but she was locked out of this

account because she was "hacked" and could not remember the phone number or email address she used to access the account. []. She testified that the decedent maintained three accounts under the name Raquel Calderon, but that she only communicated with the decedent on one of those accounts. []. She said her mother's accounts are still active on Facebook, but she does not have access to them. []. Mario testified that he has a Facebook account under the name Mario Hidalgo, but that he forgot the password when he changed his phone. [].

Plaintiffs admitted that they communicated with the decedent frequently on her journey from Guatemala to the United States. Mario spoke with the decedent daily on the journey, on the bus, when she arrived in Mexico, and briefly from the desert. []. He testified that when he left Guatemala in 2010, he communicated with the decedent through video calls, regular calls, and messages via Facebook Messenger and WhatsApp. []. Luisa testified that her mother and Mario communicated via Facebook Messenger before she left Guatemala in October 2016. [].

Luisa testified that when her mother left their home in Guatemala, she had a smart phone with internet capabilities, and that she and her mother frequently communicated with each other over Facebook Messenger every other day. []. She testified that after her mother left for the United States she also communicated with Mario about her mother's trip over Facebook Messenger and WhatsApp. []. After the decedent died, Luisa communicated with Mario about her mother and this lawsuit over Facebook Messenger and WhatsApp, and she speaks with Mario daily on Facebook Messenger or by video calls. []. She testified that family and friends learned of the decedent's death because an article about her death was shared over Facebook. [].

(ECF No. 108 at 7-9) (internal citations omitted).

Attached to Plaintiffs' pleading on the discovery dispute are emails to and from counsel for Plaintiffs and counsel for CoreCivic. An email from CoreCivic's counsel to Plaintiffs' counsel dated June 9, 2021, is as follows:

. . . Based on your clients' testimony at their depositions, it is abundantly clear that Plaintiffs communicated with each other and with the decedent during the relevant timeframe using Facebook and WhatsApp, and that Plaintiffs continue to communicate using these platforms.

It is our understanding that your clients maintain(ed) the following Facebook accounts: [Mario Hidalgo Luisa Calderon Luisa Hidalgo]

We are also aware that the decedent maintained two Facebook accounts, both using the name "Raquel Calderon." Please be advised that we are not requesting this information as to [B.H.].

- 16 -

Plaintiffs' contention that they cannot access certain accounts, including the decedent's, is unavailing – recovery of passwords and login information can be requested through Facebook. Moreover, to protect your clients' privacy, we will agree to designate all of this information as confidential under the Protective Order.

Plaintiffs have a duty to disclose and produce all relevant information and documentation concerning their liability claims and their emotional distress damages claims. It is clear that Plaintiffs have not done so, despite Plaintiffs' verified discovery responses indicating otherwise. Communication between Plaintiffs and the decedent during her journey to the United States is absolutely relevant to this case. As are any and all communications between Plaintiffs during this time, up to and including after she died. Any and all communications between Plaintiffs involving their mental and/or emotional states is likewise relevant. As previously stated, case law overwhelmingly supports disclosure of social media accounts, including information that is not publicly available.

In addition, we are requesting further information pertaining to "America's Voice" as described by Mario during his deposition. Please clarify what this is (whether this was an app, messaging service, money transfer platform, or group), what it was used for, and during what time.

(ECF No. 107-9 at 2).

In response, Plaintiffs' counsel argued:

On May 12, 2021, you reiterated that you do not seek entire downloads of Facebook and What's App messages nor all messages from Plaintiffs to decedent. You stated that you are only seeking relevant social media content and What's App messages.

However, your recent correspondence requesting "Facebook downloads and WhatsApp data and messages" appears to be a request for the entire downloads of that information again. Although you stated you are not making this request with respect to the minor Plaintiff, B.H. An entire Facebook download includes all actions taken on the network including all activity, status updates, messages, likes, relationships, messages, published content, groups, search history, follows, followers, connections, credit cards, events, shares, photos, videos, apps, websites, chats, blocked contacts, facial recognition data, quotes, friend requests, games, IP addresses, locations, linked accounts, marketplace, page visits, people viewed, pokes, political views, profile visits, etc. Your request for entire Facebook downloads, if that is your renewed request, includes information which is private, the request is overbroad and not proportionate to the needs of the case.

An entire What's App download includes all messages and media with all contacts. Your request for entire What's App data and downloads, if

- 17 -

that is your renewed request, includes information which is private, the request is overbroad and not proportionate to the needs of the case.

I'd like to note that at the time of Raquel Calderon de Hidalgo's death, Luisa Hidalgo was 15 years old. Plaintiffs do not agree to produce entire downloads of Luisa Hidalgo's social media or What's App messages from before she was 18 years of age. Nevertheless, she has no documents responsive to your request related to her mother from before she was 18 years old.

Plaintiffs have not claimed lost wages, loss of employment, inability to attend school or employment or suffering any mental or emotional disability by the loss of their wife or mother. In contrast, Plaintiffs claim they suffered bereavement one would normally expect would occur by the loss of a spouse or parent.

The cases you cite, Brown[3] and Holter, as an example, reflect claims of mental disabilities not remotely found in this case where there is no independent cause of action for emotional distress, no loss of employment, inability to attend school, or loss of function.

Plaintiffs have no documents responsive to your request that contain any content (including but not limited to posts, messages, photos, etc.) discussing or depicting the decedent's apprehension and arrest by U.S. Border Patrol; the decedent's detention after her arrest; any medical conditions of decedent; any reference to depression, anxiety, or mental disability before or after the decedent's death; anything relating to CoreCivic or any of its employees. Plaintiffs intend to supplement their response to clarify that they have no documents related to this content responsive to your request.

Based on you request to supplement their responses regarding Facebook and What's App messages, my clients agree to produce relevant posts and or messages that relate to the death of Raquel Calderon de Hidalgo or her journey to the United States as well as to clarify they have no other documents responsive to your requests as stated herein. Specifically, Plaintiffs have no messages to or from Ms. Calderon de Hidalgo either in Facebook messenger or What's App or any other social media or in any phone or device and intend to supplement their response to specifically state. With respect to social media posts, my clients have located approximately 4

---

[3] CoreCivic cites *Brown v. City of Ferguson*, 2017 WL 386544 (E.C. Mo. Jan 27, 2017), in their pleading on the discovery dispute, for the proposition that: "Private information not available for public view (including private communications sent using Facebook Messenger) is also discoverable." (ECF No. 108 at 23). CoreCivic cites this case for the proposition that it is "entitled to a broad scope of discovery into Plaintiffs'" social media accounts and communications because the discovery would "showcase any other factors that could have contributed to [Plaintiffs'] emotional distress, the extent and/or magnitude of the emotional distress, or whether they suffered from emotional distress at all." (*Id.*).

Facebook posts that relate to Ms. Calderon de Hidalgo after her death and they intend to produce those posts responsive to your request. Plaintiffs do not have access to Ms. Calderon de Hidalgo's social media profiles. Your correspondence also requests further information on prior social media profiles no longer accessible or maintained by Plaintiffs and Plaintiffs agree to provide further information about why it's impossible for Plaintiffs to access those accounts.

(ECF No. 107-9 at 5-6).

CoreCivic's counsel responded:

To clarify, CoreCivic is requesting that Plaintiffs produce the entire Facebook download for Mario, Luisa's two accounts, and Ms. Calderon's two accounts mentioned in my prior email, along with all WhatsApp messages and data from January 1, 2016 to present. Despite your prior representations that no correspondence exists, both Mario and Luisa confirmed at their depositions that they frequently utilized both platforms to communicate with Ms. Calderon and each other. (See Mario Hidalgo Depo, Vol. 1 at 50-51; Luisa Calderon Depo at 41-47, 69, 70). Any relevant information and communications would be saved on those platforms unless your clients deleted this data, in which case a question arises as to whether this constitutes spoliation. We would like to review this data to determine what is relevant. As previously stated, there may be FRE 403 considerations which would prevent the evidence from being admitted at trial.

We understand that Luisa was a minor during the relevant timeframe, but we agreed that these items should be produced under the Protective Order, which moots your privacy objections.

We disagree with your contention that Plaintiffs cannot access Ms. Calderon's accounts, or other accounts that Plaintiffs no longer maintain. We also disagree with your contention that bereavement does not equate to emotional distress.

Please provide case law supporting this assertion.

(ECF No. 107-9 at 7).

Plaintiffs' counsel responded:

Plaintiffs rely on the authority you cited. In *EEOC v. Simply Storage*, the court ultimately allowed discovery of the claimant's communications which related to any emotion, feelings or mental state or referenced events which could reasonably be expected to produce significant emotional responses. However, in issuing that order, the court recognized that such discovery was appropriate for alleged *severe emotional distress*, as opposed to "*garden variety*" emotional distress. Similar reasoning was expressed by the other courts you cited.

- 19 -

Plaintiffs have not suffered any physical injuries or suffered PTSD, anxiety or depression. Granting access to Plaintiffs' entire Facebook history would provide minimal relevant information while exposing substantial irrelevant information. As such, the discovery would exceed the proper limits of proportionality.

Furthermore, clients do not have access to any Facebook accounts that existed at the time of Ms. Calderon de Hidalgo's death. They both gave that testimony in deposition and I request that portion of their testimony be provided to the Court should you include other testimony. The reason they do not have access is because they no longer have the email or phone numbers associated with the prior accounts in order to reset the passwords because they had been "hacked."

Plaintiffs do not have access to Ms. Calderon de Hidalgo's social media profiles. Plaintiffs do not have any messenger or Whats App messages to/from or regarding Ms. Calderon de Hidalgo.

(ECF No. 107-9 at 7-8). In response, Defendant's counsel maintained:

Your clients can access Ms. Calderon's accounts, as well as any accounts that have been "hacked" by referring to Facebook's Help Center. Third parties are not capable of subpoenaing or obtaining this information. Your clients simply need to provide authenticating documentation to Facebook, which will allow them to gain access. For instance, Mario can gain access to his wife's accounts by going through the process at the link below: https://www.facebook.com/help/contact/398036060275245

We imagine that WhatsApp data can be obtained using a similar process. This information can be found through Google. It is not Defendants' responsibility to conduct this leg work. Not once have you indicated that you or your clients attempted to gain access to these accounts by contacting Facebook. Your continued wholesale refusal to produce this information is concerning, especially because there is ample reason to believe that relevant information exists.

Your position that your clients' general bereavement does not constitute emotional distress damages is unsupported and does not make logical sense, and your attempt to distinguish the case law provided is inapposite. Both Luisa and Mario testified that they frequently communicated with Ms. Calderon using Facebook Messenger and WhatsApp. And because your clients are making a claim for emotional damages, CoreCivic is entitled to explore any alternative or contributing causes. If you are claiming your clients suffered no injury, then they are precluded from asserting a wrongful death claim.

(ECF No. 107-9 at 8-9).

## IV.    Argument

Plaintiffs argue:

> . . . Request for Production No. 8 requested ESI regarding communication *from November 26, 2016 to current*. Plaintiffs have no documents responsive to this request because Decedent died on November 27, 2016 and the last day they communicated with her through messenger or Whatsapp was before she was in ICE Custody. Despite CoreCivic's misapprehension about the scope of their original request, Plaintiffs further supplemented their response to verify that they have no correspondence to, from, or about Decedent *from any time*.
>
> Plaintiffs complaint alleges *garden variety* emotional distress in that Plaintiffs suffered bereavement after the loss of their spouse and mother. Plaintiffs do not claim any physical injury from the loss of Decedent, nor do they claim lost earnings, inability to find gainful employment, inability to attend school or the like due to defendant's negligence. Therefore, even if Defendant made the proper request in the written discovery, complete downloads are not relevant or proportionate to the needs of the case.

(ECF No. 106 at 3-4) (emphasis in original).

> Plaintiffs assert they submitted adequate responses to Interrogatory No. 7
>
> . . . because interrogatory No. 7 requests Plaintiffs identify accounts *maintained* by the Plaintiffs and Decedent. [Ex. 1] According to Black's law dictionary, "maintained" means "To continue (something)" and, therefore, that the failure to supply information from social media accounts which have been closed was not required by the interrogatory because the closed accounts have not been "maintained."

(ECF No. 106 at 15-16) (emphasis in original). Plaintiffs further assert that they do not "have custody and control of any prior accounts," and that they never had control of Decedent's Facebook account. (*Id.*). Additionally, Plaintiffs aver their own research as to the issues presented regarding the discovery of social media content are generally in cases involving employment, rather than medical negligence and wrongful death. (ECF No. 106 at 18-21).

Additionally, Plaintiffs argue:

> Defendants may argue they cannot subpoena the account information directly from Facebook because of Facebook's stated position that they do not disclose entire Facebook data pursuant to a civil subpoena. Facebook takes the position that the Stored Communication's Act, 18 U.S.C. §2701, prohibits it "from disclosing the contents of an account to any non-

governmental entity pursuant to a subpoena or court order." However, Facebook's interpretation of the statute is not controlling law of this case. Additionally, Facebook does state that they disclose basic account information pursuant to a civil subpoena.

The statute which governs disclosure of content (18 USC 2701, Stored Wire and Electronic communications records access) is a criminal statute dating to 1986. Plaintiffs do not agree with Facebook's simplistic and inaccurate explanation of it. Defendant CoreCivic could request the content of prior Facebook Accounts (that Plaintiffs no longer maintain) through subpoena, court order and notice. That has not been done in this case.

(ECF No. 106 at 24-25).

CoreCivic contends the content of Plaintiffs' and Decedent's social messaging accounts is relevant both to the issues of CoreCivic's liability and Plaintiff's damages. CoreCivic argues:

In any event, any communications between Plaintiffs, the decedent, and third parties related to Plaintiffs' liability claims are relevant. Fed. R. Evid. 403. This includes all communications Plaintiffs had with the decedent from the time she left her home in Guatemala in October 2016 to the time she was arrested by Border Patrol on November 17, 2016, and any communications the decedent or Plaintiffs had with each other or third parties leading up to and during her journey to the United States pertaining to her travels, state of mind, plans, goals, and interactions.

Significantly, there is reason to believe that the decedent suffered from other underlying medical conditions that could have caused and/or contributed to her death. [footnote 13: For instance, the United States produced recorded telephone calls and between Mario and the decedent during her detention at EDC and transcripts of these calls translated from Spanish to English. During the calls, Mario repeatedly referenced the decedent's sickness and/or illness, and prior instances where the decedent had fevers and "lost her mind." Luisa testified that her mother refused to video chat with her during her journey to the United States because she did not want Luisa to see her so thin. []. She testified further that after her mother married Mario in 2008, she stopped working because Mario said she looked tired and was very thin. [].] Plaintiffs have not produced a single medical record in this case, aside from the emergency room medical records obtained from Banner Medical Center. Because there are no medical records in this case, Defendants must look to other evidence—namely communications the decedent or Plaintiffs may have had about her condition—to discover whether the decedent suffered from any other illness or underlying condition.

(ECF No. 108 at 18-19 & n.13). CoreCivic also asserts:

> Communications the decedent had with Plaintiffs and third parties about any sickness/illness, underlying condition, symptoms and/or physical limitations are relevant and proportional to the needs of this case because they could potentially offer the only source of evidence to rebut Plaintiffs' liability claims. There is also evidence that the decedent was not exhibiting outward signs or symptoms of any serious medical condition aside from mild symptoms associated with her sprained ankle. [footnote 14: Mario testified that he spoke to the decedent frequently over the phone during her detention at EDC, and that she only experienced "light pain" because of her foot, but that she was fine, happy, and did not seem sick. []. He testified that she would go out to "play" on the recreation yard, and never told him she had trouble walking. []. Mario also testified that he was communicating with the decedent's roommate and her roommate's mother while the decedent was detained and after she died. [].] Thus, communications the Plaintiffs had with each other or third parties after the decedent's death may be relevant to determine whether the decedent exhibited the symptoms Plaintiffs claim she did. Finally, Luisa testified that she has discussed this lawsuit and the decedent with Mario, and that she continues to communicate with Mario daily as "father to daughter" using Facebook Messenger and WhatsApp. []. Accordingly, any and all communications between Luisa and Mario and third parties regarding this lawsuit, or the claims or defenses asserted are relevant to this case.

(ECF No. 108 at 19-20).

With regard to the relevance of the sought-after discovery to the issue of Plaintiffs' damages, Core Civic contends:

> . . . information that is relevant to Plaintiffs' emotional distress damages includes, but is not limited to, content and communications concerning the following: (1) Plaintiffs' emotions, feelings, and mental state, or any event that could reasonably be expected to produce a significant emotion, feeling, or mental state; (2) the relationship between Plaintiffs and the decedent and each other; (3) the relationships between Plaintiffs and any other friends, family, or significant others; (4) the events leading up to the decedent's travels to the United States, and during her travels and detention up to her death, and immediately after her death; (5) Mario and the decedent's parenting of Luisa and B.H.; (6) and, Plaintiffs' lifestyle before and after the decedent's death. *Brown*, 2017 WL 386544, at *2; *Simply Storage*, 270 F.R.D. at 436. None of the information requested need directly relate to the facts or claims asserted in the operative complaint. [*Id.* at 435-46].

The content and communications requested applies to information contained on all of Plaintiffs' and the decedent's previously or currently maintained Facebook and WhatsApp accounts. CoreCivic agrees to limit the timeframe from November 27, 2011 to present, mooting Plaintiffs' proportionality objection that CoreCivic's requests are unlimited in time and scope. As shown above, there is minimal burden in accessing and downloading these accounts, and no expense. The absence of this information will substantially prejudice CoreCivic and will require it to defend this case on unequal terms. *See* Cal. Psychiatric Transitions, 258 F.R.D. at 400 ("To protect the records would allow Plaintiff to proceed with a claim on unequal terms."). This information is thus relevant and proportional pursuant to Rule 26(b)(1).

Because Plaintiffs have not been forthcoming on these issues, and to avoid any further delay and nondisclosure in this case, CoreCivic is requesting that Plaintiffs produce all Facebook downloads and WhatsApp messages to determine what is relevant. *See Hinostroza*, 2018 WL 3212014, at \*6. (While "[o]ne moment of happiness illustrated by social media" will not undermine a party's claims, "social media discovery must allow the requesting party a sufficient sample size from which a potential pattern of content could reveal an emotional or mental state or physical capability that undermines a party's claims."); *see also Bass ex rel. Bass v. Miss Porter's Sch.*, No. 3:08 CV 1807 (JBA), 2009 WL 3724968, at \*1 (D. Conn. Oct. 27, 2009) ("[R]elevance of the content of Plaintiff's [social media information] as to both liability and damages . . . is more in the eye of the beholder than subject to strict legal demarcations, and production should not be limited to Plaintiff's own determination of what may be [relevant]."). In the alternative, Plaintiffs should be required to produce a detailed relevance log describing all information not produced, including the type and content, and if any information was deleted and when.

(ECF No. 108 at 26-27).[4]

---

[4] *Simply Storage* involved claims of sexual harassment in an employment context. The court determined the appropriate scope of relevance with regard to claims of emotional distress included "profiles, postings, or messages (including status updates, wall comments, causes joined, groups joined, activity streams, blog entries)" that revealed, referred, or related "to any emotion, feeling, or mental state . . ." *E.E.O.C. v. Simply Storage Mgmt.*, LLC, 270 F.R.D. 430, 436 (S.D. Ind. 2010). The court further stated:

This Order is directed toward two claimants who have alleged severe emotional distress, including post-traumatic stress disorder; it does not address the proper scope of discovery for "garden variety emotional distress claims." Production of the information required by this Order also obviously does not preclude objections to admissibility at a later stage or requests for return of

CoreCivic further asserts:

> Plaintiffs' counsel is aware that third parties are not permitted to subpoena Facebook for Plaintiffs' or the decedent's account information or content. [footnote 8: The Facebook Help Center website states specifically that federal law does not allow private parties to obtain the content of communications using subpoenas, and that parties to litigation may satisfy "discovery requirements relating to their Facebook accounts by producing and authenticating the content of communications from their accounts and by using Facebook's 'Download Your Information' tool." "If a person cannot access their content, Facebook may, to the extent possible, attempt to restore access to deactivated accounts to allow the person to collect and produce their content. However, Facebook cannot restore account content that has been deleted." *Id.*]

(ECF No. 108 at 16-17).

CoreCivic further contends:

> With respect to WhatsApp messages, CoreCivic's counsel has conducted its own investigation and is of the understanding that WhatsApp uses "end-to-end encryption" where messages exchanged are stored on a user's device, and not WhatsApp servers after they are delivered. This, however, does not mean that any messages exchanged on a device are unrecoverable if the user no longer has that device. There are a plethora of mechanisms and instructions on the WhatsApp Help Center website which allow a user to restore chat history and messages through iCloud, Google Drive, or a local backup. There is no evidence that Plaintiffs or their counsel attempted to do this.
>
> [footnote 9: The accessibility of WhatsApp messages was not identified as a disputed issue in CoreCivic's discovery dispute e-mail to the

produced materials if the litigation develops in a direction that casts doubt on its relevance.

> The court agrees with the EEOC that broad discovery of the claimants' SNS could reveal private information that may embarrass them. Other courts have observed, however, that this is the inevitable result of alleging these sorts of injuries. Further, the court finds that this concern is outweighed by the fact that the production here would be of information that the claimants have already shared with at least one other person through private messages or a larger number of people through postings. As one judge observed, "Facebook is not used as a means by which account holders carry on monologues with themselves." *Leduc*, 2009 CanLII 6838, at ¶ 31. The court has entered an agreed protective order that limits disclosure of certain discovery materials, and counsel should confer about whether that protection is appropriate here.

*Id.* at 437.

- 25 -

> Court; however, Plaintiffs' Second Further Responses stated for the first time that neither Mario, nor Luisa possess any relevant messages on their currently maintained WhatsApp accounts, and that they cannot access any prior WhatsApp accounts because they no longer maintain the phone or phone number used at the time of the incident.]

(ECF No. 108 at 17 & n.9).

CoreCivic cites the Facebook Help Center website, which provides a mechanism for individuals to gain access to Facebook accounts in the event of an account holder's death, and to Facebook's available instructions on how to gain access to an individual's own account in the event of a lost password or login information, or if they believe an account has been hacked. CoreCivic also contends that "Plaintiffs' representations in their Second Further discovery responses that they conducted a 'reasonable and diligent' search for the requested information is likewise insufficient, as Plaintiffs are required to state what the search entailed to show that it was reasonable under the circumstances." (ECF No. 108 at 15-16, *citing Rogers v. Giurbino*, 288 F.R.D. 469, 485 (S.D. Cal. 2012) (holding that, if after a reasonable inquiry no responsive documents are found to exist, the "party should so state with sufficient specificity to allow the Court to determine whether the party made a reasonable inquiry and exercised due diligence.")).

With respect to the disagreement over whether Ms. Calderon's social messaging content from her minority is discoverable, CoreCivic contends:

> Plaintiffs waived this objection by failing to assert it in response to any discovery request prior to its Second Further Responses (see Ex. A, C, D, and F), and failing to assert it at any time during Luisa's deposition, where she testified almost exclusively about experiences she had and events that occurred while she was a minor. (See Ex. G, generally) *Richmark*, 959 F.2d at 1473.
>
> Luisa turned 18 years old on May 23, 2019. []. Plaintiffs have provided no reason for this objection or its bases, and instead seek a blanket preclusion of all discoverable information during the relevant timeframe merely because she was a minor. It is unclear what specifically, if anything, Plaintiffs are objecting to, what they seek to exclude from disclosure and/or production, and why the production of relevant materials under the Protective Order would not suffice to protect Luisa's privacy. In any event, Luisa is now an adult, and it is well-established that social media content is not protected

- 26 -

by a right of privacy. *Brown*, 2017 WL 386544, at *1. Plaintiffs' boilerplate and unsupported objection is insufficient. *Gorrell*, 292 F.R.D. at 632.

(ECF No. 108 at 27).

The Court has also considered Plaintiffs' argument that

. . . [t]he Defendant CoreCivic's claim that it would be unable to challenge Plaintiff's damage claims is exaggerated. Defendants have been effectively defending such garden variety emotional distress claims for decades before social media meta data existed. Plaintiffs cannot think of a situation where a person publishes content to social media that indicates they are either happy or sad about some other issue but also could not be suffering from the loss of a spouse or parent. Nor can Plaintiffs fathom how the meta data all of the other data that would be disclosed from an entire Facebook download could be useful to a defense in this case. Therefore, Plaintiffs request that the Court deny Defendant CoreCivic's request for social media discovery for the accounts identified in Interrogatory No. 7 as well as deny any request for additional ESI because Plaintiffs stated in their verified response that there are no other documents responsive to its request.

(ECF No. 106 at 21-22). The Court has also considered the following argument:

The Defendant posits that that there would be very little time or expense involved in the initial production of Plaintiffs['] entire Facebook history. However, it's not difficult to imagine a plaintiff being required to explain every statement contained within a lengthy Facebook history in which he or she expressed some degree of angst or emotional distress or discussing life events which could be conceived to cause emotion upset, but which is extremely personal and embarrassing. There is also substantial risk that the fear of humiliation and embarrassment will dissuade injured plaintiffs from seeking recovery for legitimate damages or abandon legitimate claims.

(ECF No. 106 at 23).

## V.    Relevant Legal Opinions

The Court is unable to locate any controlling published legal opinion directly on point. However, as a point of reference, the Court notes the following decisions discussing the issues presented by the parties.

Some opinions considering similar issues indicate that social media corporations, such as Facebook, have resisted subpoenas in order to protect the privacy interests of its users, and federal law does impose some obstacles to some access. For example, a

California federal court has held that the federal Stored Communications Act ("SCA") applies to messages exchanged over the Facebook and MySpace social networks. *See Crispin v. Christian Audigier, Inc.*, 717 F. Supp. 2d 965, 971-72, 982 (C.D. Cal. 2010). The *Crispin* court found that these website corporations were providers of communication services within the meaning of the SCA and were therefore prohibited from divulging private communications without the user's consent and, thus, the corporations were not susceptible to a subpoena duces tecum. *See also Ehling v. Monmouth-Ocean Hosp. Serv. Corp.*, 961 F. Supp. 2d 659, 667-69 (D.N.J. 2013). In *Crispin*, granting a motion to quash in part (the motion being brought by the plaintiff rather than the social media company), the court remanded for a determination of the plaintiff's profile privacy settings, concluding that to the extent the plaintiff's Facebook "wall" and MySpace "comments" were not closed to the public, those portions of the accounts fell beyond the protections of the SCA. The court posited that this would, in theory, leave Facebook susceptible to a subpoena seeking all public postings by the plaintiff.

In a case involving a personal injury action and applying state rules governing discovery, a New York court concluded private information sought from the plaintiff's social networking website accounts was material and necessary to the defense theory of the case, because the plaintiff claimed that due to her injuries she was largely confined to bed but a publicly-posted photo showed her outside the home; the defendants inferred there was private information on the social networking sites purportedly containing further contradictions to plaintiff's claims. *See Romano v. Steelcase Inc.*, 907 N.Y. 2d 650, 657, 30 Misc. 3d 426, 434-35 (N.Y. Sup. Ct. 2010). However, in *Romano* the court noted the defendant had attempted other methods of obtaining discovery on this point, such as taking depositions, but was unsuccessful in these attempts.[5] In the instant matter CoreCivic

---

[5] The *Romano* court ordered the plaintiff to execute any authorization required by the operators of Facebook and MySpace to allow access to the pages' contents by defendant, permitting the defendant to gain access to the plaintiff's Facebook and MySpace records, including any records previously deleted or archived. 30 Misc. 3d at 435. The court ordered the defendant's counsel to serve a copy of the authorization and the court's order subpoenaing the requisite information on Facebook and MySpace. *Id.*

appears to have obtained substantial information from both Mr. Hidalgo Lopez and Ms. Calderon's depositions.

With regard to the issue of privacy, the District of New Mexico has noted:

> Courts within the Tenth Circuit generally do not consider social media content as "private." As Judge Browning from this District observed, "only the most ignorant or gullible think what they post on the internet is or remains private." *Tapia v. City of Albuquerque*, [] 2014 WL 1285647 (D.N.M. Mar. 31, 2014) (unpublished) (citing *United States v. Meregildo*, 883 F. Supp. 2d 523, 526 (S.D.N.Y. 2012) (a person who posts to his Facebook profile has "no justifiable expectation that his 'friends' would keep his profile private")); *see also*, *E.E.O.C. v. Original Honeybaked Ham Co. of Georgia*, [] 2012 WL 5430974, *2 (D. Colo. 2012) (unpublished) ("storing such information on Facebook and making it accessible to others presents an even stronger case for production, at least as it concerns any privacy objection").

*Marquez v. Board of Cnty. Comm'r Eddy Cnty.*, 2015 WL 13638613m at *1 (D.N.M. Jan. 13, 2015). And, in *Tompkins v. Detroit Metropolitan Airport* the court concluded "that material posted on a 'private' Facebook page, that is accessible to a selected group of recipients but not available for viewing by the general public, is generally not privileged, nor is it protected by common law or civil law notions of privacy." 278 F.R.D. 387, 388 (E.D. Mich. 2012).

And in a case issuing from the Eastern District of Tennessee, in the context of a motion to quash a subpoena issued to a non-party manager of a Facebook group page to obtain all postings on that page, the court noted:

> "[T]here is no dispute that social media information may be a source of relevant information that is discoverable." *Georgel v. Preece*, [] 2014 WL 12647776, at *3 (E.D. Ky. Feb. 28, 2014) (quoting *Reid v. Ingerman Smith LLP*, [] 2012 WL 6720752, at *1 (E.D.N.Y. Dec. 27, 2012)); *see*, *e.g.*, *Terrell v. Memphis Zoo, Inc.*, [] 2018 WL 3520139, at *4 (W.D. Tenn. July 20, 2018). However, this discoverability does not grant parties "a generalized right to rummage at will through information that [an opposing party] has limited from public view," and the party seeking private social media information must still establish under Rule 26 that the requested discovery is relevant and proportional to the needs of the case. *T.C on Behalf of S.C. v. Metro. Gov't of Nashville*, [] 2018 WL 3348728, at *14 (M.D. Tenn. July 9, 2018) (internal quotation omitted). "Consequently, courts have denied

blanket requests for the contents of social media accounts and instead required that parties bring narrowed requests for information related to the issues in the case." *Terrell*, 2018 WL 3520139 at *4.

*Adkisson v. Jacobs Eng'g Grp., Inc.*, 2020 WL 6549386, at *2 (E.D. Tenn. Nov. 6, 2020). In *Adkisson* the court found the defendants had established the relevancy of the sought-after information because the defendant had cited to deposition testimony establishing that the subject Facebook group page included "discussion of the Plaintiff's medical condition." *Id.*, 2020 WL 6549386, at *3. The court further concluded that the communications on the group page were not privileged because non-parties were members of the group and the plaintiff had not demonstrated how the posts on the group page "could include extremely private or highly sensitive information concerning the *non-parties*." *Id.*, 2020 WL 6549386, at *3.

However, another Tennessee federal court considering these issues determined:

The production of a social media account's contents in full will therefore rarely be appropriate. Every relevant communication may be buried in a thicket of unrelated musings, "likes," gifs, selfies, and emoticons that are not appropriately discovered. Nor does the fact that a plaintiff's mental or emotional state is at issue automatically justify sweeping discovery of social media content. *See Giacchetto v. Patchogue-Medford Union Free Sch. Dist.*, 293 F.R.D. 112, 115 (E.D.N.Y. 2013); *Johnson*, 2013 WL 4508128, at *2; *Rozell v. Ross-Holst*, [] 2006 WL 163143, at *3 (S.D.N.Y. Jan. 20, 2006). Social media may make a daily record of a party's thoughts and feelings available at the click of a mouse (or at least those thoughts and feelings the party determines are worthy of sharing with a virtual community of "friends"). But just as "[n]o court would have allowed unlimited depositions of every friend, social acquaintance, co-employee or relative of a plaintiff to inquire as to all disclosures, conversations or observations," the party seeking to discover those thoughts and feelings via social media must still make a showing of relevance and proportionality to the claims of the litigation. *Gordon v. T.G.R. Logistics, Inc.*, 321 F.R.D. 401, 403 (D. Wyo. 2017); *see also Giacchetto*, 293 F.R.D. at 116; *Reid v. Ingerman Smith LLP*, [] 2012 WL 6720752, at *2-3 (E.D.N.Y. Dec. 27, 2012); *E.E.O.C. v. Simply Storage Mgmt., LLC*, 270 F.R.D. 430, 430 (S.D. Ind. 2010).

*T.C on Behalf of S.C. v. Metropolitan Gov't of Nashville & Davidson Cnty., Tenn.*, 2018 WL 3348728, at *14 (M.D. Tenn. July 9, 2018).

In *Moore v. Miller* a Colorado federal court considered the plaintiff's compliance with the defendant's request that the plaintiff produce "his entire Facebook history." 2013 WL 2456114 at *2 (D. Colo. 2013). The plaintiff argued the information was irrelevant and invasive of his privacy. *Id.* The court ordered the discovery be produced, noting the plaintiff had alleged both physical injury and emotional distress, and that "the scope of discovery is particularly broad, and relevance of a plaintiff's entire Facebook activity has been recognized in other cases involving allegations of physical injury and mental distress." *Id.*, *citing Held v. Ferrellgas*, 2011 WL 3896513, at *1 (D. Kan. Aug. 31, 2011). The *Moore* court further stated:

> Both parties have mentioned in camera review of [plaintiff's] Facebook history, with [plaintiff] preferring such review over producing directly to Defendants and Defendants preferring such review over not having the information being produced at all. In camera review should be employed only where no other remedy is adequate. Here, the Court's standard protective order will adequately address any privacy concerns the parties may have.

*Id.*

Additionally, in *Gordon v. T.G.R. Logistics, Inc.*, the court concluded that, in a personal injury action seeking damages for physical injuries and damages for posttraumatic stress disorder, anxiety, and depression, the defendant was not entitled to discovery of the plaintiff's entire social media communication history for three years prior to date of accident, because granting discovery for this period would have provided minimal relevant information, exposed substantial irrelevant information, and exceeded the proper limits of proportionality. *See* 321 F.R.D. 401, 403-04 (D. Wyo. 2017). The court noted the plaintiff argued their claim was for "garden variety emotional distress," and that access to the communications prior to the accident would not significantly contribute to an evaluation and diagnosis of the plaintiff's pre-accident conditions, and concluded:

> The Defendant correctly observes that there would be very little time or expense involved in the initial production of Plaintiff's Facebook history. That's true on the front end. The problem is that such vast information has the potential to generate additional discovery or impact trial testimony. It's

not difficult to imagine a plaintiff being required to explain every statement contained within a lengthy Facebook history in which he or she expressed some degree of angst or emotional distress or discussing life events which could be conceived to cause emotion upset, but which is extremely personal and embarrassing. There is also substantial risk that the fear of humiliation and embarrassment will dissuade injured plaintiffs *404 from seeking recovery for legitimate damages or abandon legitimate claims. That being said, Defendant has a legitimate interest in discovery which is important to the claims and damages it is being asked to pay. Information in social media which reveals that the plaintiff is lying or exaggerating his or her injuries should not be protected from disclosure. Courts must balance these realities regarding discovery of social media and that is what most of the courts which have addressed this issue have done.

*Id.*

However, the court also noted: "The Defendant's claim that it would be unable to challenge Plaintiff's damage claims is exaggerated. Defendants have been effectively defending such garden variety emotional distress claims for many years and such claims typically make up a small part of the damages in physical injury cases." *Id.* at 405-06. Nonetheless, because the court "was not convinced that all relevant social media subsequent to [the accident] has been produced[,] [t]he Plaintiff will be required to produce all relevant history which addresses Plaintiff's significant emotional turmoil, any mental disability or ability, or relate significant events which could reasonably be expected to result in emotional distress." *Id.* at 406.

## VI.    Conclusion

The Court notes that an entire Facebook download includes all actions taken by the user, including not only status updates, but also messages, likes, relationships, published content, groups, search history, follows, followers, connections, credit cards, events, shares, photos, videos, apps, websites, chats, blocked contacts, facial recognition data, quotes, friend requests, games, IP addresses, locations, linked accounts, marketplace, page visits, people viewed, pokes, political views, and profile visits, etc. Much of this information would not be even tangentially relevant to CoreCivic's liability or Plaintiffs' damages, and some of this information could be possibly incriminating or certainly

embarrassing, particularly to a young girl, or it could be seen as unreasonably intrusive as to the grief felt by a young girl who has lost her mother.

The Court finds Decedent's physical condition and any pre-existing chronic physical ailments or the absence thereof, and her relationships with her husband and children prior to her detention, are relevant to the issue of CoreCivic's liability for her demise and Plaintiffs' damages. However, particularly in light of the deposition testimony of Mr. Hidalgo Lopez and Ms. Calderon, the Court further finds that seeking all of posts and communications from Decedent, Mr. Hidalgo Lopez, and Ms. Calderon's Facebook and WhatsApp accounts for the five years prior to death is overbroad, unduly burdensome, and not likely to lead to the discovery of admissible evidence. Similarly, seeking all communications between Decedent, Mr. Hidalgo Lopez, Ms. Calderon, and third parties for the five years prior to her death and four years subsequent to her death is overbroad, unduly burdensome, and not likely to lead to the discovery of admissible evidence. Accordingly, Plaintiffs will be compelled to produce "social media" discovery, i.e., discovery from Facebook and WhatsApp accounts, only with regard to the time frame November 17, 2015 (the year prior to Decedent's detention and death) through November 20, 2020, the date CoreCivic's First Set of Interrogatories and Requests for Production to Plaintiff were served.

With regard to the Decedent's social media accounts, i.e., WhatsApp and Facebook, the parties do not dispute that Plaintiffs do not have possession or custody of the contents of these accounts. The parties do not dispute Plaintiffs do not have possession or custody of the cell phone Decedent used to access these accounts. Accordingly, the issue is whether Plaintiffs have control of the contents of these accounts.

The Court finds that, with regard to **Decedent's** Facebook and WhatsApp communications, the information sought by CoreCivic is relevant, and CoreCivic has established Mr. Hidalgo Lopez is the party having the legal right to obtain the documents requested upon demand, i.e., he is in "control" of this information. The Court further finds that the most sure and expedient method of obtaining this discovery is by means of Mr.

Hidalgo Lopez utilizing Facebook's and WhatsApp's established methodology for gaining access to Decedent's accounts. Accordingly, Mr. Hidalgo Lopez must utilize **both** Facebook's and WhatsApp's established methodology for recovering the accounts of Decedent identified in Plaintiffs' response and supplemental responses to Interrogatory No. 7, including but not limited to utilizing the procedure at: https://www.facebook.com/help/contact/398036060275245.

Mr. Hidalog Lopez shall produce a full download of all of Decedent's activity on all of her identified Facebook and WhatsApp accounts from November 26, 2015, through the date of her death. If Mr. Hidalgo Lopez is unable to access the accounts and produce this discovery, he or his counsel shall file with the Court and serve on CoreCivic an affidavit or declaration under penalty of perjury confirming that Mr. Hidalgo Lopez utilized both Facebook's and WhatsApp's procedures and describing all steps taken to retrieve the requested information from Decedent's accounts, including his attempts to utilize all of the help mechanisms specified by Corizon in their pleadings and communications with Plaintiffs and Plaintiffs' counsel.

Additionally, the Court finds that Mr. Hidalgo Lopez must utilize Facebook and WhatsApp's established methodology for recovering the accounts utilized by him and identified in all of the responses and supplemental responses to Interrogatory No. 7, on any account active during the period from November 27, 2015 through November 20, 2020. Mr. Hildalgo Lopez must produce all downloadable Facebook content and WhatsApp messages from all accounts referenced in the responses to Interrogatory No. 7; in the alternative, Mr. Hidalgo Lopez should produce any and all content and/or messages that are relevant to his liability and damages claims, and produce a relevance log describing all information not produced, including the type of communication (photo, purchase, like, comment, status post, conversation, message, event, published article, etc.), and content (discussion about plans, discussion not related to his wife or his wife's death or this lawsuit, etc.). If Mr. Hidalgo Lopez is unable to access the accounts and produce this discovery, he or his counsel shall file with the Court and serve on CoreCivic an affidavit or declaration

under penalty of perjury confirming that Mr. Hidalgo Lopez unsuccessfully utilized both Facebook's and WhatsApp's procedures and describing all steps taken to retrieve the requested information from his accounts, including his attempts to utilize all of the help mechanisms specified by CoreCivic in its pleadings and communications with Plaintiffs and Plaintiffs' counsel.

With regard to Ms. Calderon's social media and messaging accounts, the Court finds that, because Ms. Calderon was apparently thoroughly deposed regarding her communications with and relationship with her mother and the impacts of her mother's demise on her emotional state prior to attaining the age of majority, and because CoreCivic does not seek social media discovery from B.H., presumably based on his status as a minor, Ms. Calderon will be required to produce downloads of her Facebook and WhatsApp accounts only from May 23, 2019, the date of her eighteenth birthday, through November 20, 2020, the date CoreCivic's First Set of Interrogatories and Requests for Production to Plaintiff were served. Ms. Calderon must produce all downloadable Facebook content and WhatsApp messages from all accounts referenced in the responses to Interrogatory No. 7 Facebook and WhatsApp accounts, from May 23, 2019 through November 20, 2020. In the alternative, Ms. Calderon should produce any and all content and/or messages that are relevant to her liability and damages claims, and produce a relevance log generally describing all information not produced, including the type (photo, comment, status post, conversation, likes, purchases, public article, message, etc.), and content (discussion about plans, related to another person's status, events, discussion not related to her mother or her mother's death or this lawsuit, etc.). If Ms. Calderon is unable to access the accounts and produce this discovery, she or her counsel shall file with the Court and serve on CoreCivic an affidavit or declaration under penalty of perjury confirming that Ms. Calderon unsuccessfully utilized both Facebook's and WhatsApp's procedures and describing all steps taken to retrieve the requested information from her accounts.

The compelled discovery delineated *supra* shall include all communications exchanged on WhatsApp and Facebook Messenger between Plaintiffs and/or Decedent

- 35 -

and/or third parties with regard to Decedent's relationship with her husband and children, her physical condition, her death, and this lawsuit, from November 27, 2015, through November 20, 2020, on the social media accounts opened, closed, or maintained by Mr. Hidalgo Lopez, Ms. Calderon, and Decedent identified in Plaintiffs' responses to Interrogatory No. 7.

With regard to Plaintiffs' responses to Interrogatory No. 10, to the extent this order regarding Plaintiffs' and Decedent's Facebook and WhatsApp disclosure presented *supra* does not address the alleged "deficiencies" in Plaintiffs' responses to this interrogatory, the Court concludes that CoreCivic is not entitled to additional discovery with regard to this interrogatory other than that specified in this Order.

The Court further **orders** that all discovery provided pursuant to this Order shall be subject to the provisions of the Protective Order at ECF No. 74. Specifically, any information, photograph, conversation, message, or post disclosed pursuant to this order shall not be disclosed to any individual or entity other than the parties to this matter, used for any purpose by any party to this matter other than for the litigation of this matter, and all reference to or use of a specific photograph, information, conversation, message or post disclosed pursuant to this order shall not enter the public docket in this matter except under seal. Furthermore, all Defendants and all Defendants' counsel are admonished to review the social media discovery in an appropriate, considerate, and professional manner.

Plaintiffs shall have until **August 20, 2021**, to comply with this order.

Dated this 26th day of July, 2021.

Camille D. Bibles
United States Magistrate Judge