**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mario Rene Hidalgo Lopez, et al., | No. CV-19-04332-PHX-ROS (CDB) |
| Plaintiffs, | **ORDER** |
| v. | |
| CoreCivic, et al., | |
| Defendants. | |

In November 2016, Raquel Calderon de Hidalgo was apprehended by the U.S. Border Patrol and housed in a detention center. A few days after arriving at the detention center, she died. Her husband and children subsequently filed this suit against the United States, Corecivic (the owner and operator of the detention center), and InGenesis (a company that provided some of the medical staff at the detention center). While conducting discovery, one of Plaintiffs' attorneys had extensive contact with a doctor formerly employed by the United States at the detention center. It is undisputed such contact occurred, but the parties disagree on whether the contact violated the relevant ethical rule and, if so, the appropriate remedy. The conduct violated the Ethical Rule as that rule has been interpreted by the Arizona Court of Appeals. Based on that violation, the attorney will be disqualified. However, Plaintiffs' other counsel will be allowed to remain.

## BACKGROUND

Some of the following facts are drawn from the Fourth Amended Complaint while

others are drawn from the briefing on the motion to disqualify counsel.  (Doc. 52).  For the most part, the crucial facts regarding the contact between counsel and a former governmental employee are undisputed.

In November 2016, Ms. Calderon de Hidalgo, a native of Guatemala, crossed into the United States through the desert on the Southern Border.  On November 17, 2016, she was arrested in Arizona by the U.S. Border Patrol.  Ms. Calderon de Hidalgo had been injured at some point during her journey and she immediately complained to federal agents that she was in pain.  The present record does not explain whether she received treatment at that time or where she was held immediately following her arrest.  But on November 20, 2016, she was taken to a hospital emergency room.  After being examined, she "was diagnosed with an ankle sprain, soft tissue injury of her right knee and ankle, and a headache due to trauma." (Doc. 52 at 5).  Ms. Calderon de Hidalgo was discharged with a prescription for ibuprofen as well as instructions that she "follow up with a primary care provider." (Doc. 52 at 6).  The present record does not disclose where Ms. Calderon de Hidalgo was held immediately after being discharged.

On November 23, 2016, Ms. Calderon de Hidalgo was transferred to the Eloy Detention Center.  The operation of that detention center involves a confusing arrangement of federal, local, and private actors.  It is necessary to outline that arrangement in detail to understand the present dispute involving the contacts Plaintiffs' counsel had with a former federal employee who worked at the detention center.

The United States and the City of Eloy have an agreement through which the City of Eloy provides "detention services" for individuals in the custody of the United States Immigration and Customs Enforcement.  The City of Eloy, however, has a separate contract with Corecivic, a private company, for Corecivic to perform those services.  Thus, while the United States' agreement is with the City of Eloy, it is Corecivic that runs the Eloy Detention Center and performs most services at the detention center.  Corecivic does not, however, operate the detention center's medical clinic.

Instead of Corecivic, the United States' ICE Health Services Corps, a governmental

entity, operates the medical clinic at the detention center.  The United States has decided to staff the clinic with a combination of federal employees and "contractor staff."  At times relevant to the present suit, the United States contracted with a private company, InGenesis, "to provide staffing and support" at the detention center's medical clinic.  Thus, InGenesis employed at least some of the "Registered Nurses and Licensed Practical Nurses" working at the detention enter.  (Doc. 52 at 4).  While InGenesis provided some medical staff, the overall management of the medical clinic was the responsibility of two federal, not InGenesis, employees.  One federal employee was the "Health Services Administrator" and the other was the "Clinical Director."  The Clinical Director provided "clinical supervision of all medical staff" at the detention center.  (Doc. 118-2 at 23).  Dr. Kenneth Merchant was the Clinical Director while Ms. Calderon de Hidalgo was at the detention center.

After arriving at the detention center on November 23, Ms. Calderon de Hidalgo was examined by a federal employee, Nurse Shannon Bradford.  Nurse Bradford concluded Ms. Calderon de Hidalgo should be seen by a Nurse Practitioner employed by InGenesis.  For undisclosed reasons, the InGenesis Nurse Practitioner did not examine Ms. Calderon de Hidalgo.  Over the following days, federal and InGenesis employees allegedly failed to provide adequate medical care to Ms. Calderon de Hidalgo.  On November 27, 2016, Ms. Calderon de Hidalgo died.  Her "death certificate listed her immediate cause of death as Pulmonary Embolism [blood clot in the lungs] due to, or as a consequence of, deep vein thrombosis."  (Doc. 52 at 9).

In June 2019, Ms. Calderon de Hidalgo's husband and children ("Plaintiffs") filed the present suit.  The operative complaint alleges a claim against the United States under the Federal Tort Claims Act, a state-law negligence claim against Corecivic, and a state-law negligence claim against InGenesis.  The claim against the United States is premised on the actions by employees of the United States being "the direct and proximate cause" of Ms. Calderon de Hidalgo's death.  (Doc. 52 at 14).  In particular, the complaint alleges the United States, through its employees, caused Ms. Calderon de Hidalgo's death through

1    various negligent acts, including "negligent supervision of the staff and understaffing

2    positions" at the medical clinic as well as "negligent training and failure to train . . . medical

3    staff." (Doc. 52 at 16). Given that Dr. Merchant was the Clinical Director with supervisory

4    responsibility over the medical clinic's staff, Plaintiffs' initial allegation of "negligent

5    supervision" potentially reached Dr. Merchant's conduct.

6          Shortly after the United States answered the complaint, it served its initial

7    disclosures. Those initial disclosures stated Dr. Merchant "had a telephone encounter with

8    [Ms. Calderon de Hidalgo] during her" initial medical evaluation. (Doc. 121 at 6). In

9    February 2021, Plaintiffs responded to an interrogatory from the United States asking

10   Plaintiffs to set forth "each specific act by any federal employee that you assert or allege

11   fell below the applicable standard of care." (Doc. 118-3 at 11). In doing so Plaintiffs

12   identified Dr. Merchant and stated Dr. Merchant's actions "fell below the standard of care

13   by failing to properly supervise his subordinates" and Dr. Merchant had failed to ensure

14   Ms. Calderon de Hidalgo "received a proper workup, including physical exam . . . and

15   treatment from a medical provider." (Doc. 118-3 at 12). In May 2021, the United Sates

16   responded to an interrogatory from Plaintiffs seeking information regarding the "chain of

17   command" at the detention center. (Doc. 118-2 at 8). The United States' response stated

18   Dr. Merchant was the Clinical Director providing "oversight over the provision of medical

19   care." (Doc. 118-2 at 10).

20         On May 7, 2021, the United States provided a supplemental initial disclosure that

21   stated Dr. Merchant was no longer a federal employee and, contrary to the United States'

22   previous statements, Dr. Merchant "did not see or care for [Ms. Calderon de Hidalgo] while

23   she was in custody." (Doc. 118-2 at 14). The United States admitted, however, that Dr.

24   Merchant reviewed Ms. Calderon de Hidalgo's "medical records after she died" and he

25   was involved in post-death investigations. Thus, as that time, the United States believed

26   Dr. Merchant "may have information regarding" his records review and subsequent

27   investigations. (Doc. 118-2 at 14).

28         On June 4, 2021, one of Plaintiffs' attorneys, Scott Hughes, received a telephone

- 4 -

call from Dr. Merchant.  Hughes describes that initial contact as "unsolicited and unexpected."  (Doc. 121-1 at 2).  During that call Hughes informed Dr. Merchant he "needed to research the ethics of whether [he could] speak with [Dr. Merchant]."  (Doc. 121-1 at 3).  The initial phone call lasted "1-3 minutes."  Hughes subsequently spent five days researching the Arizona Ethical Rules.  In doing so, Hughes located and read *Lang v. Superior Court*, 826 P.2d 1228 (Ariz. Ct. App. 1992), which interprets the relevant ethical rule and purports to place limits on when Arizona attorneys may communicate with a represented party's former employee.  Hughes then spoke with multiple colleagues about the issue.  After his research and consultations, Hughes concluded the Arizona ethical rules did not prevent him speaking with Dr. Merchant.

On June 9, 2021, Dr. Merchant contacted Hughes again.  Through subsequent telephone and email communications, Hughes and Dr. Merchant agreed Dr. Merchant would act as a medical expert in the current case for $200 per hour.  (Doc. 121-1 at 7).  Hughes had Dr. Merchant execute a written agreement to that effect.  Thus, as of June 10, 2021, Dr. Merchant was formally working for Hughes.

Once the expert agreement was in place, Hughes and Dr. Merchant had extensive communications, including seven hours of telephone conversations, over one hundred text messages, and many emails.  During those communications Dr. Merchant opined Ms. Calderon de Hidalgo "died tragically and unnecessarily, due to the negligence of nurses, nurse practitioners and security guards working at the Eloy Detention Center."  (Doc. 121-1 at 7).  Counsel for the United States was unaware these communications were occurring.

On July 12, 2021, Hughes emailed the United States' counsel and asked about serving deposition subpoenas on Dr. Merchant and another federal employee, Bessie Padilla.  That email stated:

> My recollection is that I'd need to subpoena both Padilla and Merchant and serve each of them individually rather than through your office, correct?  If so, do you have their contact information so that I can schedule the service and pass that on to our process server?

(Doc. 120-1 at 175).  There is no explanation why Hughes requested Dr. Merchant's

"contact information" given that Dr. Merchant was already working as Hughes' paid expert. The United States believes this email shows Hughes was attempting to keep secret his arrangement with Dr. Merchant. (Doc. 118 at 15).

On July 13, 2021, counsel for the United States learned Hughes and Dr. Merchant were communicating. The United States immediately requested a full explanation from Hughes regarding his contacts with Dr. Merchant. Hughes refused to provide an explanation. The parties then contacted the Magistrate Judge handling pretrial matters for assistance. After a telephonic hearing, the Magistrate Judge stayed all matters and ordered Hughes to submit an affidavit outlining his contacts with Dr. Merchant. (Doc. 113). Hughes did so and, one week later, the United States filed a motion to disqualify Hughes. (Doc. 118).

According to the United States' motion, Hughes' conduct violated Arizona Ethical Rule 4.2 regarding contact with a former employee of a represented party. The United States requests Hughes be disqualified as counsel, Hughes be prohibited from distributing any information he learned from Dr. Merchant, all information Hughes learned from Dr. Merchant be excluded, and Plaintiffs' remaining counsel be prohibited from contacting Hughes. (Doc. 118 at 16). Corecivic and InGenesis joined the motion. (Doc. 119, 120). InGenesis agreed with the scope of relief requested by the United States. Corecivic, however, requested disqualification of Hughes as well as Plaintiffs' other counsel, Thien Nguyen and Elliott Alford, on the basis that "Hughes presumably shared information he obtained from Dr. Merchant with his co-counsel." (Doc. 120 at 1). Hughes and his co-counsel opposed the motion and joinders.[1] To avoid any question regarding a Magistrate Judge's authority to resolve a disqualification motion, the reference to the Magistrate Judge was withdrawn regarding the United States' motion.

## ANALYSIS

---

[1] The opposition to the motion and joinders was twenty-nine pages, well over the seventeen-page limit for such a filing. Mr. Hughes did not seek an extension of the page limit and the United States requests the Court either strike the opposition or "disregard all pages exceeding 17 pages." (Doc. 123 at 1). To avoid any delay, the Court will consider the entire opposition.

1    Hughes is a California attorney admitted pro hac vice in this case.  Pursuant to Local

2    Rule 83.2(e), "The 'Rules of Professional Conduct,' in the Rules of the Supreme Court of

3    the State of Arizona, shall apply to attorneys . . . authorized to practice before" this court.

4    Thus, Arizona Rule of Professional Conduct 4.2 presumptively applies in this case.  That

5    rule states, in full:

6                In representing a client, a lawyer shall not communicate about
             the subject of the representation with a party the lawyer knows
7            to be represented by another lawyer in the matter, unless the
             lawyer has the consent of the other lawyer or is authorized by
8            law to do so.

9

10   There is an accompanying comment to Rule 4.2 that addresses the situation when a

11   represented party is an organization.  That comment states:

12               In the case of an organization, this Rule prohibits
             communications by a lawyer for one party concerning the
13           matter in representation with persons having a managerial
             responsibility on behalf of the organization, and with any other
14           person whose act or omission in connection with that matter
             may be imputed to the organization for purposes of civil or
15           criminal liability or whose statement may constitute an
             admission on the part of the organization. If an agent or
16           employee of the organization is represented in the matter by
             counsel, the consent by that counsel to a communication will
17           be sufficient for purposes of this Rule.

18   ER 4.2 (comment 2).  Neither Rule 4.2 nor the comment specifically address contact with

19   former employees of a represented party.

20       In *Lang v. Superior Court*, 826 P.2d 1228 (Ariz. Ct. App. 1992), the Arizona Court

21   of Appeals addressed the reach of Rule 4.2 and its accompanying comment in the context

22   of former employees.  According to *Lang*, Rule 4.2 and its comment permit limited *ex*

23   *parte* contact between counsel and a represented party's former employees.  Pursuant to

24   *Lang*, Rule 4.2 and its comment do "not bar counsel from having *ex parte* contacts with a

25   former employee of an opposing party where the former employer is represented by

26   counsel *unless* the acts or omissions of the former employee gave rise to the underlying

27   litigation." *Id.* at 1233.

28       The United States' motion to disqualify assumes the *Lang* decision *must* be

1    followed.  (Doc. 123 at 5) (describing *Lang* as "controlling Arizona case law").  That is not

2    correct.[2]  But Hughes does not attack the general applicability of *Lang*.  Instead, he accepts

3    *Lang* applies in federal court as a general matter but he argues the particular circumstances

4    in this case mean *Lang* does not apply.  Following the parties' lead, the Court will assume

5    the rule established in *Lang* presumptively applies in federal court.  The question, therefore,

6    is whether Hughes has offered a persuasive basis to not apply *Lang*.  He has not.

7         Hughes first argues "*Lang* does not apply to former United States government

8    employees."  (Doc. 121 at 15).  The basis for this argument is not entirely clear but Hughes

9    seems to believe governmental employers should be treated differently than private

10    employers.  Rule 4.2 speaks to communications with a represented party and there is no

11    indication in the rule itself that the outcome should differ depending on whether the

12    represented party is a private or governmental entity.  The Arizona Court of Appeals has

13    already concluded Rule 4.2 applies to former employees of state government.  *State ex rel.*

14    *Arizona Dep't of Health Servs. v. Gottsfield*, 146 P.3d 574, 577 (Ariz. Ct. App. 2006)

15    (applying Rule 4.2 to *ex parte* contact with employees of state government).  Based on the

16    text of Rule 4.2 and *Lang*, there is no reason to differentiate between the types of

17    employers.  Therefore, the fact that the United States is the former employer at issue does

18    not preclude application of *Lang*.[3]

19         Hughes' second argument is that Rule 4.2 and *Lang* do not apply because Dr.

20    Merchant's actions or inactions have no relevance to the claims Plaintiffs continue to

21    pursue at the present time.  In other words, Hughes believes there are no acts or omissions

---

[2] Regulating attorney conduct in federal court is a federal matter, beyond direct regulation by state courts.  *See In re Kramer*, 193 F.3d 1131, 1132 (9th Cir. 1999) ("[A] state court's disciplinary action is not conclusively binding on federal courts.").  And, in some circumstances, this Court has not followed *Lang*.

[3] Hughes presents another argument that the United States should be treated differently under Rule 4.2 because of "sovereign immunity."  According to Hughes, "liability does not get 'imputed' to the United States like it would with a corporation because the United States generally has sovereign immunity."  (Doc. 121 at 5).  This sovereign immunity argument appears irrelevant to the present suit involving claims brought under the Federal Tort Claims Act.  Imputation of liability to the United States is precisely the point of the FTCA.  *See* 28 U.S.C. § 1346(b)(1) (rendering the United States liable for "negligent or wrongful act or omission of any employee of the Government").  Thus, whatever impact issues of sovereign immunity might have in other suits, sovereign immunity is irrelevant to the present suit.

by Dr. Merchant that might impact the still-pending claims.  This argument depends on the evolution of Plaintiffs' claims in recent months.  That evolution, however, does not change the conclusion that, under *Lang*, contact with Dr. Merchant was prohibited at the time the contact occurred.

Earlier in this suit Plaintiffs were pursuing claims against the United States based, in part, on acts or omissions by Dr. Merchant.  For example, in one of their discovery disclosures, Plaintiffs stated "Dr. Merchant fell below the standard of care by failing to properly supervise his subordinates."  (Doc. 118).  Up to the time when Hughes and Dr. Merchant began having *ex parte* contacts, Plaintiffs' claims were based, at least in part, on Dr. Merchant's acts or omissions.  Hughes now explains Plaintiffs have revised their liability theories such that Dr. Merchant's actions are no longer at issue.  (Doc. 121 at 13).  But Rule 4.2 and *Lang* depend on the claims pending at the time of the prohibited contact, not subsequent developments.

As set forth in *Lang*, counsel may not have *ex parte* contacts with a former employee when that individual's "act or omission . . . may be imputed to the organization for purposes of civil . . .  liability."  When determining whether the acts or omissions "may be imputed to the organization," the relevant time is when the *ex parte* communications occur.  That is, *Lang* prohibits communications with a former employee if, at the time of the communications, the plaintiff's allegations raise the possibility that the former employee's acts or omissions will be at issue in the litigation.  That is precisely the situation here.  Hughes spoke with Dr. Merchant at a time when Plaintiffs believed Dr. Merchant's behavior might be imputed to the United States and while Plaintiffs were pursuing claims based on Dr. Merchant's behavior.  Thus, the contacts were prohibited at the time they occurred.

Under the rule established in *Lang*, Hughes' contacts with Dr. Merchant violated Rule 4.2.  The only remaining issue is the appropriate remedy.  Given the extent of prohibited contacts between Hughes and Dr. Merchant, the appropriate remedy is the disqualification of Hughes.  Based on the present record, however, there is no need to

1  disqualify Plaintiffs' other counsel.  There is no evidence Hughes shared all the information
2  gained from Dr. Merchant with his co-counsel.  In fact, the United States' motion does not
3  even seek the disqualification of Plaintiffs' other counsel.  Moreover, Plaintiffs likely
4  remain entitled to discover through legitimate means most, if not all, of the information Dr.
5  Merchant shared with Hughes.  Thus, disqualifying all of Plaintiffs' counsel would be
6  unduly harsh.  Disqualifying Hughes, however, is the appropriate remedy under the
7  assumption shared by the parties that *Lang* applies.

8          Accordingly,

9          **IT IS ORDERED** the Motion for Sanctions (Doc. 118) is **GRANTED**.  Scott
10  Hughes may not appear as counsel for Plaintiffs in this matter.  Hughes shall not provide
11  information he learned from Dr. Merchant to Plaintiffs' remaining counsel and Plaintiffs'
12  remaining counsel may not have *ex parte* contacts with Dr. Merchant.

13          Dated this 9th day of December, 2021.

                                        Honorable Roslyn O. Silver
                                        Senior United States District Judge

- 10 -