**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Mario Rene Hidalgo Lopez, individually and as successor in interest to the deceased Raquel Evangelina Calderon de Hidalgo, and as guardian of B.H. and L.H., <br><br> Plaintiff, <br><br> v. <br><br> CoreCivic, United States of America, InGenesis Incorporated, <br><br> Defendants. | No. CV 19-04332 PHX ROS (CDB) <br><br> **ORDER** |

Before the Court is Defendant CoreCivic's Motion to Compel Plaintiffs to Produce Documents Relied on by Plaintiffs' Expert Roger Clark at his Deposition. (ECF No. 185).

**I.      Background**

The following facts are taken from the operative Fourth Amended Complaint.

> 17. On or about November 17, 2016, [the decedent was apprehended by the United States Border Patrol near the southern Arizona border.]
> 18. After complaining of severe pain to Border Patrol agents and officials for three days, on November 20, 2016, DECEDENT was sent to Banner University Medical Center. A urinalysis and complete metabolic panel revealed abnormal labs and an x-ray of the right tibia fibula, reviewed by [a] M.D. revealed: mild soft tissue edema of the right foot. DECEDENT was diagnosed with an ankle sprain, soft tissue injury of her right knee and ankle, and a headache due to trauma.

(ECF No. 52 at 5). On November 23, 2016, the decedent ("Hidalgo") was released from the hospital and taken into custody by the United States Immigration and Customs Enforcement Agency ("ICE"). (ECF No. 52 at 6). Hidalgo was transported to the Eloy Detention Center, which is privately owned and operated by Defendant CoreCivic. (*Id.*).

During intake at the detention center a medical screening was performed, during which a registered nurse (RN Bradford) designated Hidalgo's medical condition as "'priority one (PR1-1),' meaning [Hidalgo] needed to be seen by a provider before being sent to housing. RN Bradford's determination was largely based on [Hidalgo]'s emergency room paperwork from Banner University Medical Center." (*Id.*).

20. A subsequent medical and mental health intake screening also conducted by IHSC RN Lieutenant Bradford resulted in [Hidalgo] being designated as "Physical Examination – Complex," *meaning she required a physical examination by a provider within twenty-four hours*. RN Bradford informed the clinic's Nurse Practitioner (NP) [] Bradberry of INGENESIS, of [Hidalgo]'s injuries, ailment, and vitals. However, RN Bradford failed to notify NP Bradberry of [Hidalgo]'s pain level rated 7/10. NP Bradberry stated that after receiving both of RN Bradford's telephone encounters, she went to the intake area and called [Hidalgo]'s name. When she received no response from [Hidalgo], she moved on to the next detainee. She deemed it non-urgent and scheduled [Hidalgo]'s physical examination with a provider for two days later with INGENESIS NP [] Montenegro. Medical staff's disregard of the meanings behind the "PRI-1" and "Physical Examination – Complex" statuses demonstrate the initial level of disregard that led to the [Hidalgo]'s death under their care.

21. That afternoon, [Hidalgo] and nine others were transferred to Echo 600, a medical clearance unit for possible varicella exposure. CORECIVIC Officer [] Castillo, the Echo 600 housing officer, noticed [Hidalgo]'s limp, and she informed him she hurt her ankle crossing the border.

22. After a phone call between IHSC RN Lieutenant Bradford and NP Bradberry later that day, INGENESIS NP Bradberry ordered [Hidalgo] to take daily doses of ibuprofen and acetaminophen as keep-on-person medications. However, the EDC pharmacy was closed at this time, and the order was not processed, nor did the nursing staff retrieve the medications for [Hidalgo] from the overnight stock cabinet. The lack of her prescription being processed caused [Hidalgo]'s pain and condition to worsen while under the care of Defendants.

23. The next day, [Hidalgo] told INGENESIS RN Michelle Wilkie, who was on nursing rounds in Echo 600, that her level of ankle pain was at a 9/10. INGENESIS RN Wilkie merely gave [Hidalgo] a one-day supply of ibuprofen and acetaminophen and instructed [Hidalgo] to apply alternating cold and hot compresses.

24. On November 25, 2016, the day of [Hidalgo]'s scheduled physical examination with INGENESIS NP Montenegro, NP Montenegro did not conduct [Hidalgo]'s physical examination in the Echo 600 unit because there

were too many patients, and he chose to see people he believed were higher on the priority list. Later that morning, [Hidalgo] was moved to Bravo 300, a general population unit, after her varicella results came back negative. Despite her sprained ankle, [Hidalgo] was assigned to an upper bunk in the Bravo 300 unit by CoreCivic staff. After [Hidalgo] had been moved to the general population unit, a pharmacy technician finally filled her prescription and attempted to deliver it to the quarantine unit Echo 600. When the technician did not find [Hidalgo] in the Echo 600 unit, he returned the medications to a pharmacy bin designated for later deliver; however, he never informed the nurse that the medications needed to be delivered and *the medications were never provided to* [Hidalgo]. The pharmacy technician ended his shift early and closed the pharmacy.

25. On November 26, 2016, [Hidalgo] went to the medical unit because she was in pain. RN Bradford, not aided by an interpreter, checked her vitals and noticed she had a high pulse (120 beats per minute) and low oxygen saturation level. [Hidalgo] reported her pain level as a nine out of ten. Without the assistance of an interpreter, RN Bradford communicated with [Hidalgo] using only hand motions. RN Bradford subsequently notified INGENESIS NP Montenegro that [Hidalgo] needed to see a provider, but INGENESIS NP Montenegro did not see [Hidalgo] at that time.

26. *While [Hidalgo] waited to be seen by INGENESIS NP Montenegro, there was a shift change for the officers on duty. During this process, CORECIVIC Officer Castillo put [Hidalgo]'s identification card in the stack indicating she was part of the group of individuals who had been seen by a provider and were cleared to be sent back to their unit. Because of this, the new EDC officer on duty, Officer Kassandra Cienfuegos, sent [Hidalgo] back to the Bravo 300 unit, meaning [Hidalgo] was specifically escorted out of the medical ward without receiving her necessary treatment. [Hidalgo] was never seen by a provider. Upon returning to her housing unit, [Hidalgo] reported she did not receive treatment earlier and was still in tremendous pain. The Bravo 300 officer, Officer Erica Villalobos, reported to the Desk Officer, Officer Joaquin Archiniega, that [Hidalgo] was crying and complaining of pain, and Officer Archiniega agreed to contact medical. However, Officer Archiniega never contacted medical. [Hidalgo]'s housing locations, transfer status, and status of care were consistently negligently documented by CoreCivic and INGENISIS employees.*

27. On November 27, 2016, at 9:24 a.m, approximately eighteen hours after [Hidalgo] was again denied medical care, [Hidalgo] was ordered to walk outside by CoreCivic employees for the recreation call. [Hidalgo] collapsed while in the yard for outdoor recreation period and experienced a seizure. [Hidalgo] was said to be foaming at the mount and appeared to have urinated herself. Four minutes later … INGENESIS NP Montenegro, followed by RN [] Forlemu and LNP [] McHugh, both from INGENESIS,

arrived on the scene and took [Hidalgo]'s vitals, which showed a pulse of 130 beats per minute and a low oxygen saturation level of 95%. … [S]ix minutes after [Hidalgo]'s vitals were taken, EDC central control called 911. … fifteen minutes after [Hidalgo]'s seizure, the nurses and Officer Ferraro took [Hidalgo] to the medical unit. [Hidalgo] had a second seizure while being transported to the medical unit. When [Hidalgo] and the nurses finally arrived at the medical unit, [Hidalgo] was put on oxygen. Her vitals at this time showed her oxygen saturation level was 76%. Sometime between 9:45 a.m. and 9:50 a.m., Eloy Fire District arrived and assumed care of [Hidalgo]. She was transported to Banner Casa Grande Medical Center's emergency department.

28. [Hidalgo] arrived at Banner Casa Grande Medical Center at 10:20 a.m. Over the course of the next fifty-seven minutes, [Hidalgo] coded and was resuscitated three times. At 11:17 a.m., [Hidalgo] was pronounced dead.

29. An autopsy was performed. [Hidalgo]'s death certificate listed her immediate cause of death as Pulmonary Embolism due to, or as a consequence of, deep vein thrombosis.

30. The Emergency Physician noted that [Hidalgo]'s cardiac arrest was "very much in question" because she was so young and presumptively had no cardiac history.

(ECF No. 52 at 6-9) (emphasis added).

In the Fourth Amended Complaint Plaintiffs assert a Federal Tort Claims Act claim premised on the tort of wrongful death against Defendant United States; a claim for negligence resulting in wrongful death against Defendant CoreCivic, and a claim for negligence resulting in wrongful death against Defendant InGenesis. Defendant CoreCivic is the only defendant remaining in this matter, as Plaintiffs have settled their claims with the other Defendants. (ECF No. 184; ECF No. 186).

Plaintiffs' claim with regard to the remaining Defendant, CoreCivic, is not a claim of medical malpractice:

a. Plaintiffs … allege that the negligent acts and omissions of Defendant CORECIVIC, which directly and proximately caused [Hidalgo]'s death, include but are not limited to: *The negligent failure to ensure that a medical provider saw [Hidalgo] before she left the intake area after a Registered Nurse designated [Hidalgo] as "priority one (PRI-1)," indicating that [Hidalgo] needed medical evaluation by a provider before departing to housing*;

b. *The negligent failure to provide [Hidalgo] with a wheelchair, crutches, walker, or other ambulatory aid even after a housing unit officer observed [Hidalgo] limping and [Hidalgo] informed a housing unit officer that she had hurt her ankle while crossing the border*;

c. *The negligent failure to ensure that [Hidalgo]'s appointment with a medical provider was re-scheduled before transporting her out of quarantine housing*;

d. *The negligent assignment of [Hidalgo] to an upper bunk, rather than a lower bunk more accessible to [Hidalgo] in her condition, in the general housing unit*;

e. *The negligent documentation of [Hidalgo]'s whereabouts in the housing unit, resulting in her prescribed medication never reaching her*;

f. The negligent failure to provide [Hidalgo] medication either directly or through contract;

g. *The negligent placement on November 26, 2016, of [Hidalgo]'s identification card in a pile with identification cards belonging to detainees authorized to return to their housing units, rather than in the pile with the identification cards of detainees still waiting to be seen by medical staff*; and

h. *The negligent failure on November 26, 2016, by the housing unit officers in [Hidalgo]'s housing unit to contact medical staff and return her to the clinic after [Hidalgo] informed them that she had not been treated by medical staff and was still in pain*;

i. The negligent ignoring of [Hidalgo]'s repeated pleas for medical assistance and cries of pain throughout her entire detention period at EDC; and

j. *The negligent hiring, training and supervision of CORECIVIC employees who failed to follow CORECIVIC policies and procedures as well as the laws and regulations of the United States*.

(ECF No. 52 at 19-20) (emphasis added).

Defendant CoreCivic moved to dismiss Plaintiffs' claims, arguing the factual allegations did not establish negligence (ECF No. 54 at 8); that Plaintiffs' claims should be dismissed to the extent they alleged medical negligence, because Defendant did not have any duty to provide medical care and was not vicariously liable for the acts or omissions of any non-employee (ECF No. 54 at 8-9); that Plaintiffs had alleged a medical malpractice action and Plaintiffs had not provided a preliminary expert opinion with regard to the relevant standard of care (ECF No. 54 at 10); that Plaintiffs failed to plausibly allege any CoreCivic employee's act or omission was the proximate cause of death (*id.*); that

CoreCivic's employees were adequately trained (ECF No. 54 at 13); and that Plaintiffs failed to state a plausible claim of negligent hiring and supervision (ECF No. 54 at 15-16).

The motion to dismiss was denied. (ECF No. 67). The Court concluded:

> The FAC does not allege that CoreCivic is a health care provider such that the requirements of Arizona law relating to medical malpractice claims are implicated. Nor does the FAC allege that CoreCivic failed to provide any specific medical care, but that CoreCivic failed to refer [Hidalgo] for medical treatment in a timely manner, failed to ensure she received her prescribed medications, and failed to ensure that she was appropriately housed for her medical status and conditions. Therefore, CoreCivic's argument that any medical negligence claims should be dismissed are without merit.

(ECF No. 67 at 9) (emphasis added).

With regard to Defendant's arguments that CoreCivic did not breach any duty, and that Hidalgo's injuries were not reasonably foreseeable to CoreCivic employees, the Court concluded:

> CoreCivic's arguments go more to the weight of the evidence rather than addressing whether Plaintiffs have sufficiently stated a negligence claim against CoreCivic. As to CoreCivic's specific argument that the allegations do not support the necessary elements of breach or causation, "breach and causation are ordinarily questions of fact for the jury to resolve." *Fehribach v. Smith*, 22 P.3d 508, 512 (Ariz. Ct. App. 2001).

(ECF No. 67 at 10). The Court also concluded Plaintiffs adequately stated a claim for negligent hiring, training, and supervision:

> Plaintiffs … allege, for example, that that CoreCivic employees received inadequate training "regarding persons who are in need of medical care, and/or experiencing a medical emergency," which led to [Hidalgo]'s injuries and death, and that CoreCivic failed to retrain, discipline or terminate employees who were involved in [Hidalgo]'s death. Plaintiffs have also alleged specific instances of CoreCivic officers' negligent actions such as moving [Hidalgo] to a general population unit before she saw a provider, assigning [Hidalgo] an upper bunk, misplacing [Hidalgo]'s ID card so that she was sent back to her unit without seeing a provider, and not contacting medical after [Hidalgo] reported that she did not receive medical treatment and complained of tremendous pain.

(ECF No. 67 at 12). The Court further noted:

> The Arizona cases cited by CoreCivic almost uniformly address a plaintiff's burden at summary judgment in negligent hiring, training and supervision claims. Unlike a motion to dismiss, the legal standard to survive a motion for summary judgment requires *evidence* to support a claim, and thus is a higher standard than that required to survive a motion to dismiss.

(ECF No. 67 at 12-13) (emphasis in original).

This case was assigned to the Mandatory Initial Discovery Pilot track. Discovery in this matter has closed, and the deadline for filing dispositive motions is January 31, 2023.

On May 20, 2022, Plaintiffs filed notice of their expert witness disclosure, identifying their experts and verifying they had provided the reports and information required by Rule 26(a)(1)(B) of the Federal Rules of Civil Procedure. (ECF No. 160). *Inter alia*, Plaintiffs disclosed Roger Clark as a "[j]ail expert reporting on potential non-medical negligence by staff at the Eloy Detention Center at all relevant times." (ECF No. 160 at 2).[1] As required by Rule 26(a), Clark's disclosure included a list of all legal matters in which he had provided sworn testimony, i.e., testimony by deposition or in trial or in a hearing, from February 23, 2018, through February 25, 2022. (ECF No. 188-1 at 28-47).[2]

---

[1] Plaintiffs also disclosed Dr. Simons as an expert regarding the causal link between the potentially negligent acts at the Eloy Detention Center and decedent's death, as well as the issue of the cause or causes of death and the medical record. (ECF No. 160 at 2).

[2] Prior to preparing his expert report Clark reviewed, *inter alia*, the detainee death review; witness depositions; CoreCivic's (and the other Defendants') responses to interrogatories and requests for production, and their disclosure; information provided by the National Commission on Correctional Health Care; and a publication by the American Corrections Association titled *Performance Based Standards for Adult Local Detention Facilities*. (ECF No. 188-1 at 7-8). In his Rule 26 report Clark opines "regarding the actions of CoreCivic custody personnel," and specifies that he was not "offering opinions regarding medical issues except in context that custody officers are trained that more often than not (as in this case), medical needs are first identified and referred to medical care by the custody staff." (ECF No. 188-1 at 9). Clark notes that "custody officers are trained that they are required to diligently watch for any medical need that may exist-or develop-during their assigned shifts," and the federal standard that "callous disregard" for an in-custody person['s] safety may result in discipline or prosecution." (ECF No. 188-1 at 9-10). Clark notes that industry standards and practices regarding inmates' access to "prompt medical care" find this is one of the "most basic duties and responsibilities of a jail administrator and their staff," citing as "but one" expression of this responsibility the "Performance Based National Detention Standards." (ECF No. 188-1 at 10). Clark concludes, *inter alia*, that "CoreCivic custody personnel failed to provide Ms. De Hidalgo the necessary care as required by training, policy and law (as trained)." (ECF No. 188-1 at 16). Clark emphasizes that:

CoreCivic noticed Clark's deposition and the deadline for deposing expert witnesses was extended solely for the purpose of deposing Clark and supplementing discovery. (ECF No. 178). Clark's deposition was conducted November 1, 2022, via Zoom. (ECF No. 180 at 2). Additionally, at the time of his deposition, the list regarding Clark's sworn testimony in other cases was updated. (ECF No. 185-2 at 11).

## II.    Clark's Deposition

During Clark's deposition, defense counsel asked him to provide information outside the scope of his Rule 26 disclosure, i.e., the number of cases that he "had in [his] consulting work from February of 2018 to the present in which [he] provided a report but didn't actually testify?" (ECF No. 185-2 at 13). Clark responded he did not "know exactly," but offered that he assigned sequential numbers to the cases in which he consulted; the instant matter was case number 2207 and his most recent case was assigned case number 2393, averring that since he was contacted by Plaintiffs' counsel on February 2, 2022, he had consulted "one way or another" in "roughly" 180 cases. (ECF No. 185-2 at 13-14).

Clark agreed with defense counsel that, pursuant to his updated disclosures, from February 23, 2018, through October 28, 2022, he provided testimony in approximately 326 cases. (ECF No. 185-2 at 14-15). With regard to how many of the 326 cases involved "any

---

… [after being made aware of Hidalgo's extreme pain], Officer Archiniega agreed to contact medical. However, Officer Archiniega *never contacted* medical. Ms. De Hidalgo was crying and when asked, said medical did not assist her. In [Clark's] opinion, the uncontested fact that Officer Villalobos notified Officer Archiniega that Ms. De Hidalgo should to [sic] go back to medical but neither one did anything further cannot be excused or forgiven and raises to the level of *callous disregard* as defined above.

(ECF No. 188-1 at 17) (emphasis in original). The Court notes that Archiniega was deposed (ECF No. 143), and the fact that Archiniega failed to contact medical is "uncontested in the record;" the Court notes the internal death review found this fact. (ECF No. 188-1 at 17-18). In support of his conclusions, Clark notes and agrees with the "Detainee Death Review" regarding the events in question, i.e., with regard to its "Compliance Findings," apparently quoting the reports that sufficient protocols were not in place or were disregarded with regard to ensuring Hidalgo received necessary medical care. (ECF No. 188-1 at 17-18). Clark concludes: "Taking the Defendants' set of facts as true … they failed to provide adequate care for Ms. De Hidalgo's injuries, they failed to follow policy, and their failures resulted in Ms. De Hidalgo's untimely and tragic death." (ECF No. 188-1 at 18).

testimony with respect to access to medical care in a jail, prison, or detention facility," Clark responded: "I'd have to estimate," and estimated "six – 10 to six. 10 to six." (ECF No. 185-2 at 15). Defense counsel referenced the list he presumed Clark had "in front" of him, and Clark responded that he only had the list "that was forwarded" to defense counsel prior to the deposition. (*Id.*). Defense counsel asked: "[c]an you cite to me or take a look at that list and tell me which cases fall under the category of providing expert testimony regarding access to medical care in a prison, jail or detention facility?" and Clark responded "I don't know if that – let me see what I can do here." (*Id.*). Defense counsel then asked, "just out of curiosity," what Clark was "doing" to respond to his question. (*Id.*). Clark responded he was "[s]eeing if I can get onto some sort of, *that same list that you have* and see if I can look at it, scroll it." (ECF No. 185-2 at 15-16) (emphasis added).

Clark then replied that he was trying to "see how many CoreCivic. Let me see. I can't do it that way. Let me see. Okay. So I'm going to be giving you some possibles. I think this has to with United States incarcerations and medical care," and then stated that the list he was looking at was chronological: "So I'm going to reference you to the date December 11, 2018." (ECF No. 185-2 at 16). He then corrected himself and referred to "one of those" cases listed under the date July 19, 2019, i.e., *Gocke v. United States*, and said "I think that's a custody case." (ECF No. 185-2 at 16-17). In respond to counsel's remark that "It's a custody case but does it involve access to medical care," Clark responded: "… all custody cases I have with U.S. have to do with medical care one way or the other. As I remember. This is an – I'm trying to do the best I can based on the question. I'd have to go into the file itself." (ECF No. 185-2 at 17). Counsel then inquired as to whether any other case on the list was relevant to his question, and Clark noted a case under the date of December 13, 2021, saying "I think that was one," citing *Drinan v. United States*, and a case from January 6, 2022, *Wear (Blanchard) v. United States*. (*Id.*). Clark believed that *Wear (Blanchard)* involved access to medical care in a facility ("That's what I remember at this point"). (ECF No. 185-2 at 17-18).

Counsel then asked: "Can you think of, off the top of your head, that aren't included in this list any other cases in which you've provided testimony regarding access to medical care in a prison, jail or detention facility?" and Clark responded: "As I sit here nothing comes to mind. I'd have to, I'd have to do some digging." (ECF No. 185-2 at 18). Defense counsel then asked with regard to *Gocke*, "[w]hat facility did that relate to," and Clark responded "So now you're asking me for a particular. You'll have to bear with me on that one. Just a second. I was afraid of this." (ECF No. 185-2 at 18). He stated: "I'll do the best I can here. No, That's not going to be a [medical] custody case." (*Id.*).

Defense counsel then asked: "Mr. Clark, what are you looking at right now that indicated to you that was not a custody case?" and Clark responded: "I'm looking at the, *a description of the case* [*Gocke*] *as I have it on my file here*." (ECF No. 185-2 at 19). Counsel postulated that Clark was "looking at your computer and looking at – you're inputting the name of the case and it comes up with a written description?" and Clark noted that, when he searched the name of the case on his computer, he "[Came] up with the complaint." (ECF No. 185-2 at 19). Clark then noted that the *Wear* matter involved "an incident at a post office." (*Id.*). Clark again proffered that he was "doing the best I can but I didn't expect this," apparently referencing that he did not expect to be asked to recall the specifics of more than 300 cases in which he had been involved since early 2018. (ECF No. 185-2 at 20).

Defense counsel then asked: "So, as you sit here today, going back to February of 2018 to the present, you can't come up with any cases in which you provided testimony regarding access to medical care in a prison, jail or detention facility, correct?" and Clark responded: "As I sit here, you're right." (*Id.*). In response to the question: "Going back before February of 2018, can you think of any cases in which you provided testimony either in deposition or trial regarding access to medical care in a prison, jail or detention facility?" Clark responded: "Not by name as I sit here. But I've had them. I can just say that. I've had them." (*Id.*). He agreed that the "primary focus" of his consulting work was "as a police procedures expert." (*Id.*). He agreed that the "vast majority" of the 2393 cases on which he

had consulted were related to "police procedures," qualifying that this included "custody procedures, custody administration." (*Id.*). Clark agreed with counsel that he had provided "opinions regarding something that occurred at a jail or a prison facility or a detention facility like this one," and averred there were "many cases" in which he provided an opinion with regard to "appropriate police procedures in regard to use of force, pursuit, arrest, those type of situations." (ECF No. 185-2 at 21).

Counsel then asked: "Wouldn't you agree, Mr. Clark, that in the vast majority of the 2,393 cases in which you provided consulting, that [] consulting work has been with respect to police procedures as opposed to opinions regarding jails, prisons or detention facilities?" (ECF No. 185-2 at 21). Clark allowed: "So, as I understand vast majority, would, I would categorize the vast majority are outside the custody medical arena." (*Id.*). Counsel responded: "That's not answering my question," and stated that "maybe I just need to make myself more clear." (ECF No. 185-2 at 22). He then noted that for "most" of the 27 years Clark worked in law enforcement his work was "with respect to being in a police-officer realm as opposed to custody realm …" and Clark responded: "So you're saying the last, the vast majority?" (*Id.*).

Clark then stated:

> Incidentally, let me interrupt because you got my mind going.
> If you go -- I can give you a case, I think, is the most recent for medical. And it's on your list. But I'll wait for the question.
> Okay. So, I have a fair number of cases involving custody. That's why I belong to the American Corrections Association. But as far as the denial or the provision of medical care in a custody setting, that's different and it's pretty rare for me to comment on that aspect.

(*Id.*).

Defense counsel then inquired about that case, and Clark referenced a case on "the list" regarding a 2021 deposition in *Zuniga v. San Bernadino County*, involving a detainee who gave birth in custody, was immediately "put" "back into general population and she becomes septic and dies. And there's continuous complaints and indications in the record of her downward spiral to the point that she dies." (ECF No. 185-2 at 23).

Defense counsel then inquired as to any "CoreCivic cases in which you provided testimony," noting counsel did not "see any on the list." (ECF No. 185-2 at 24). Clark allowed there were not any cases involving CoreCivic on the list going back to February of 2018. (*Id.*). When asked: "Off the top of your head can you think of any cases in which you provided testimony regarding something that may have occurred at a CoreCivic facility?" Clark stated: "Yeah. In California I have. I know the venue has been in California." Counsel responded: "I represent CoreCivic in California. I don't recall you ever testifying with respect to any cases involving the Otay Mesa or the California [C]ity facilities in California." (*Id.*). Clark averred there were "two other cases, for sure, that have involved CoreCivic that I've had in my career." (*Id.*). Counsel then asked: "Do you know the name of the cases?" and Clark responded: "I think that will be okay for me to do. Just a second. The estate of Gerardo Cruz Sanchez, et al. Case Number 17CV569...." (*Id.*).

Defense counsel then "interrupt[ed]" Clark, averring: "You never provided any testimony *in deposition* or in trial in that case, though, did you?" and Clark stated: "Well, I don't think so. Let me – is that – I thought you said what other cases I've had with CoreCivic."  (ECF No. 185-2 at 25) (emphasis added, *see infra* n.3). Counsel clarified: "Okay. But that was a case in which you provided a report but never, no testimony, correct?" and Clark agreed.  (*Id.*). Clark stated, when asked by defense counsel, that he could not recall whether any of his "opinions were excluded" by the court in the Sanchez matter, that he did not know or could not recall the outcome of that trial, and that he could not recall "why [he] didn't testify at trial" in that matter. (*Id.*).[3]

_____

[3] The Sanchez matter, i.e., *Rivera v. United States of America*, 3:17 cv 00569 AJB, in the Southern District of California, was a Federal Tort Claims Act case involving the in-custody death of a Mr. Cruz-Sanchez. The court exercised supplemental jurisdiction over the claim against CoreCivic, (a wrongful death claim involving negligent training and supervision), and a CoreCivic Corrections Officer ("CO"). The decedent was arrested and detained as a material witness to the crime of alien-smuggling. While detained at a CoreCivic facility, the decedent developed flu-like symptoms, purportedly including coughing up blood, being unable to eat due to swollen throat glands, shortness of breath, respiratory distress, and "obvious and visible pain." *Rivera v. United States of America*, 3:17 cv 00569 AJB (S.D. Cal.), ECF No. 26 at 3. Purportedly, the decedent's cellmate "begged" the defendant CO to get the decedent medical attention and the CO refused. *Id.*, ECF No. 26 at 4. Per the cellmate, the decedent's condition deteriorated, he continued to cough-

up blood, and his mattress was covered with blood. *Id.* These last allegations were contradicted by trial testimony. *Id.*, ECF No. 244. Approximately two weeks after his initial detention the decedent was transported to the emergency room and placed in intensive care where he died three days after being admitted; his death was attributed to cardiac arrest secondary to metabolic acidosis, multifocal pneumonia with acute respiratory distress syndrome, hypoxic respiratory failure, acute kidney injury secondary to acute tubular necrosis, hyperkalemia secondary to acute kidney injury, and pneumomediastinum and subcutaneous emphysema. *Id.*, ECF No. 26 at 4-5. The *Rivera* plaintiffs retained Clark as an expert witness and CoreCivic's counsel in this matter was counsel for CoreCivic in *Rivera*. As in this matter, the *Rivera* plaintiffs designated Clark to opine on, *inter alia*, failure to render aid; failure to train and supervise correctional officers; and improper housing of the decedent. Contemporaneously with filing a motion for summary judgment, CoreCivic moved to exclude Clark's expert opinions (as an expert on law enforcement and jail procedures), alleging he had "no medical training background or qualifications on developing and implementing staffing plans at detention facilities. *Id.*, ECF No. 89-1 at 6. CoreCivic further argued Clark's report and opinions should be excluded because

> (1) his report provides nothing more than a factual narrative; (2) he is not qualified to provide medical opinions; (3) his opinions rely on speculation and are ipse dixit; (4) his opinions are not reliable; (5) his opinions contain impermissible legal opinions and conclusions; and (6) his opinions are not relevant or helpful to a jury.

*Id.*, ECF No. 89-1 at 5 (filed September 14, 2018). Although Clark was disclosed as an expert, CoreCivic's counsel apparently chose not to depose him. *Id.* (the CM/ECF docket does not indicate any notice of deposition nor does the motion to exclude cite to a deposition). CoreCivic's motion for summary judgment and motion to exclude Clark's expert opinions were both granted in part and denied in part. *Id.*, ECF Nos. 128 & 129. The court concluded Clark's opinion was not improper factual narrative, and that one of his statements (regarding failure to render aid) was a legal conclusion. The court concluded one of Clark's his statements was "[a] purely common sense conclusion," and was therefore impermissible opinion testimony. *Id.*, ECF No. 129 at 7. Notably, Clark was "permitted to testify whether Defendants' conduct comported with the applicable standards," including on the issue of failure to train and supervise. *Id.*, ECF No. 129 at 7-8. The court determined Clark's conclusion, that the failure to move the decedent to a different housing assignment "led directly to his death," was inadmissible because he was not a medical expert, but that he could "testify as to inmate housing practices." *Id.*, ECF No. 129 at 8-9. With regard to summary judgment, the court found: CoreCivic did have a duty to provide healthcare to detainees; there were disputed issues of material fact as to "whether Defendants breached [their] duty to provide healthcare to detainees;" "a dispute of material facts in regard to whether [CoreCivic] provided adequate training" to the CO; and "a dispute of material fact as to whether Defendants breached the duty owed by a special relationship between jailer and jailee." *Id.*, ECF No. 128 at 10-11. Clark appeared on the trial witness list. *Id.*, ECF No. 216. On the next to the last day of trial, the plaintiffs' counsel expressed the possibility that they would not call Clark as a witness. *Id.*, ECF No. 234 at 186. Clark's testimony appears to have been foregone because the defendant CO and a detention captain proffered testimonial evidence regarding what a reasonable CO would do if a detainee displayed the symptoms alleged by the plaintiffs to have been exhibited by the decedent. *Id.*, ECF No. 234 at 189-93; ECF No. 235 at 256. On March 28, 2022, the jury found in favor of CoreCivic and the CO, and plaintiffs have appealed to the Ninth Circuit Court of Appeals.

Defense counsel asked Clark if he could recall any other "CoreCivic" case, and Clark mentioned a "Nevada case," involving Rudy Rivera. (*Id.*). Defense counsel stated: "And you haven't provided any testimony in that case either, correct?" and Clark said he did not remember doing so. (ECF No. 185-2 at 25-26). Defense counsel then noted he represented "them," in the Rivera matter, and that the case did not involve access to medical care. (ECF No. 185-2 at 26).[4]

At this point, counsel asked Clark what he was "looking at" on his computer when referring to the Sanchez and Rivera cases. (ECF No. 185-2 at 26). Clark responded that he was looking at a list of cases, i.e., a "numerical list. A nomenclature," which included all cases in which Clark had consulted and/or provided testimony since 1993. (ECF No. 185-2 at 26). Clark confirmed that there were cases on the computer list that were not "included" in the lists that counsel possessed regarding "actual testimony." (*Id.*). The questioning then proceeded to Clark's experience as a police officer, and as a lieutenant in the county jail, including his experience training and logistics. (ECF No. 185-2 at 27). The questioning then proceeded to Clark's compensation in this instant matter, his fees in general, and the amount of income earned in his consulting work. (ECF No. 185-2 at 28-29). Defense counsel mentioned "I know in 2010 you made about 100,000." (ECF No. 185-2 at 30). Clark allowed that from 1993 through 2010 he had "only consulted for the defendant twice," and that since 2010 he had consulted (and testified) for a defendant in a civil case on only once occasion. (ECF No. 185-2 at 29-30).

_____

[4] The Rivera *c*ase, *Rivera v. Bogden, et al.*, 2:17 cv-2776 JCM (D. Nev.), was a *Bivens* case, and the named institutional defendant is "Corrections Corporation of America" (in 2016 Corrections Corporation of America announced it was "rebranding" as "CoreCivic"). The case involves claims of negligence, intentional infliction of emotional distress, and false imprisonment, arising from the detention and custody of the plaintiff in solitary confinement for 355 days without ever being afforded counsel or being arraigned. In that matter Clark did file an expert witness report, which was cited in the plaintiff's response to the defendants' motion for summary judgment. *Id.*, ECF No. 72 at 6 n.38, 7. The court granted summary judgment in favor of defendant on March 13, 2020, which judgment was reversed on appeal on May 28, 2021. *Id.*, ECF Nos. 73 & 89. The parties were ordered to file a proposed joint pretrial order, and at that point Mr. Struck appeared pro hac vice on behalf of the defendant. *Id.*, ECF No. 97. The matter is set for trial in May of 2023. *Id.*, ECF No. 107.

Mr. Clark allowed that in the cases involving Immigration and Customs Enforcement on which he consulted, he could not remember any that involved "an ICE detention facility." (ECF No. 185-2 at 33). He further allowed that he had never written any articles on "jails, prisons or detention facilities," or "access to medical care in a jail, prison or detention facility."  (*Id.*).

### III.    Analysis

Defendant's motion to compel seeks an order requiring Plaintiffs to "produce the documents relied on" by Clark at his deposition, specifically mentioning the list of all prior cases since 1993. (ECF No. 185 at 4, 5). Defendant contends the "documents" relied on by Clark are relevant and discoverable, and should be produced pursuant to Rule 26(b)(1) of the Federal Rules of Civil Procedure and Federal Rule of Evidence 612.[5] Defendant argues

---

[5] Rule 612 of the Federal Rules of Evidence provides:
(a) Scope. This rule gives an adverse party certain options when a witness uses a writing to refresh memory:
(1) while testifying; or
(2) before testifying, if the court decides that justice requires the party to have those options.
(b) Adverse Party's Options; Deleting Unrelated Matter. Unless 18 U.S.C. § 3500 provides otherwise in a criminal case, an adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness about it, and to introduce in evidence any portion that relates to the witness's testimony. If the producing party claims that the writing includes unrelated matter, the court must examine the writing in camera, delete any unrelated portion, and order that the rest be delivered to the adverse party. Any portion deleted over objection must be preserved for the record.
This provision of the Federal Rules of Evidence, under which an adverse party is entitled to have a writing on which a witness relies to refresh his memory for purpose of testifying, is applicable to deposition testimony. *See*, *e.g.*, *Magee v. Paul Revere Life Ins. Co.*, 172 F.R.D. 627 (E.D.N.Y. 1997). However, apparently this issue rarely arises in the context of a deposition, and in that instance almost always in the context of the witness using the "writing" to refresh their memory with regard to the issues in the instant case, not with regard to the fact of their involvement with prior cases. The rule is generally applied to a writing which the witness (often an expert) consulted prior to or during their deposition or trial testimony, to refresh their recollection and understanding *of the events in question*. *See*, *e.g.*, *Heron Interact, Inc. v. Guidelines, Inc.*, 244 F.R.D. 75, 77 (D. Mass. 2007). Defendant does not cite to any published controlling legal opinion requiring a deponent expert witness to provide a list of all cases in which they previously consulted because they referenced such a list in response to the opposing party's question regarding consultation outside the temporal and other requirements of Rule 26.

the document Clark "relied on" during his deposition is relevant as to his qualifications as an expert witness in this matter. Defendant does not argue, and the transcript does not reflect, that Clark relied on this document to refresh his memory as to the events in question or refresh his memory regarding the formulation of any conclusion contained in his expert witness report.

Rule 26(b)(1) of the Federal Rules of Civil Procedure provides:

> (b) Discovery Scope and Limits.
> (1) Scope in General. Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is *relevant* to any party's claim or *defense* and *proportional* to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, *the parties' relative access to relevant information*, the parties' resources, *the importance of the discovery in resolving the issues*, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

(emphasis added). The 1983 amendments to Rule 26(b) encourage trial courts to exercise their broad discretion to limit and tailor discovery to avoid abuse and overuse. *E.g.*, *Roberts v. Clark Cnty. Sch. Dist.*, 312 F.R.D. 594, 601-04 (D. Nev. 2016).

Additionally,

> … Rule 26(b)(2)(C)(iii) now requires that the court, either on a motion of party, or on its own, "must limit the frequency or extent of discovery otherwise allowed" by the Federal Rules if such discovery is outside the scope of that permitted by Rule 26(b)(1) – i.e., not proportional to the needs of the case. Fed. R. Civ. P. 26(b)(C)(iii). The Advisory Committee Notes state that this amendment was included to reflect both the transfer of the proportionality factors to the scope of discovery and to indicate "that the court must still limit the frequency or extent of discovery if it is not proportional to the needs of the case." Courts, thus, have a "duty to pare down overbroad discovery requests under Rule 26(b)(2)." *Rowlin v. Alabama Dep't. of Pub. Safety*, 200 F.R.D. 459, 461 (M.D. Ala. 2001).

*Friedman v. Baca*, 2019 WL 11499068, at \*4 (D. Nev. Sept. 10, 2019)

The Court has broad discretion to decide whether to compel discovery. *E.g.*, *Phillips ex rel. Estates of Byrd v. General Motors Corp.*, 307 F.3d 1206, 1211 (9th Cir. 2002). The

party seeking to compel discovery bears the burden of demonstrating the information it seeks is relevant. *See Hancock v. Aetna Life Ins. Co.*, 321 F.R.D. 383, 390 (W.D. Wash. 2017), *cited in Corzo v. Maricopa Cnty. Cmty. Coll. Dist.*, 2018 WL 1729341, at *2 n.2 (D. Ariz. Apr. 10, 2018). Additionally, by its express terms, Rule 26 limits discovery to that which is proportional to the needs of the case. The Court may restrict or prevent discovery if it determines it will be burdensome, duplicative, unnecessarily costly, or insufficiently probative to the issues in the litigation. *See United States v. My Left Foot Children's Therapy, LLC*, 2017 WL 10442695, at *3 (D. Nev. Apr. 14, 2017), *citing Behler v. Hanlon*, 199 F.R.D. 553, 561 (D. Md. 2001); *Ragaller v. Ace Am. Ins. Co.*, 2016 WL 10599508, at *1 (D. Ariz. Sept. 16, 2016). To this end, the Court "need not condone the use of discovery to engage in fishing expeditions." *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1072 (9th Cir. 2004) (internal quotations omitted).

Information that could be used to demonstrate an expert witness's bias is discoverable. *See Behler*, 199 F.R.D. at 561 (concluding that a party may legitimately gain discovery of facts that relate to proper subjects of bias).[6] The federal courts have permitted parties to obtain discovery relating to an adverse expert's bias, including financial ties to the opposing party and similarly situated litigants; and to obtain information about reports prepared by the expert in other cases or claims. *Id.*, 199 F.R.D. 553 at 561; *Great Lakes Anesthesia, PLLC v. State Farm Mut. Auto. Ins. Co.*, 2011 WL 4507417, (E.D. Mich. Sept. 29, 2011). At the same time, the courts have limited the scope of such discovery to avoid undue burden and to protect against unwarranted intrusion into private matters that

---

[6] In *Behler*, rather than requiring the expert to assemble and produce voluminous records, the court required the expert to provide the percentage of his gross income earned for each of the preceding five years attributable to performing expert witness services on behalf of similar entities as his client in that matter, and also produce a list of cases in which the expert provided such services during the last five years, in sufficient detail to enable the plaintiff to locate the court file. The court also required the expert to disclose the name, address and telephone number of the attorney that engaged the expert in each case similar to the instant matter for the preceding ten years. *See* 199 F.R.D. at 562. In this matter, defense counsel has received a list of the cases in which Clark provided deposition or trial testimony in the last eight years (as he presumably received a full Rule 26(a) report in the Sanchez matter in 2018), accompanied by the case numbers, allowing him to obtain further information.

are not *essential* to obtaining legitimate impeachment material. *Behler*, 199 F.R.D. at 561. *See also Friedman*, 2019 WL 11499068, at *4; *My Left Foot Children's Therapy, LLC*, 2017 WL 10442695, at *3. Material sought from an expert by opposing counsel should not result in harassment, particularly when it requires material outside the limitation of Rule 26 disclosure and the information is otherwise obtainable. *Cf. Ingram v. Great Am. Ins. Co.*, 112 F. Supp. 3d 934, 940 (D. Ariz. 2015) (granting motion to compel where requested discovery was not available through deposition testimony). In *Great Lakes Anesthesia*, the court denied the disclosure of additional documents from an expert, concluding the opposing party sought records outside the temporal limitation of Rule 26, which information was voluminous and potentially privileged. *See* 2011 WL 4507417, at *5-6.

Defendant has not demonstrated that it does not have access to sufficient relevant information, or that the information on the list consulted by Clark is essential to its defense. In the instant matter Clark disclosed all of the information required by Rule 26 with regard to the cases on which he has consulted in the last four years. As noted *supra*, in the Sanchez matter, in 2018 defense counsel's firm was provided with Rule 26 disclosure by Clark, which would provide the details of Clark's consultations in the four years prior to that disclosure; accordingly, counsel has Clark's testimonial history dating to 2014, rather than just the four years required by Rule 26 with regard to this case. The "list" sought by defendant, i.e., the list Clark looked at during his deposition, is a "numerical list," or "nomenclature," of all cases in which Clark had consulted and/or provided testimony since 1993. (ECF No. 185-2 at 26). Clark confirmed that there were cases on the computer list that were not "included" in the lists that counsel possessed regarding "actual testimony," because Rule 26 does not require the expert to provide the cases in which they did not offer sworn testimony. (ECF No. 185-2 at 26). The provisions of Rule 26 do not require an expert to disclose every case on which they offered sworn testimony beyond the four-years prior to the instant matter, and the Rule does not require that they disclose any case other than those in which they provided sworn testimony, much less does it require the expert to reveal every case in which it ever consulted beyond the rule's temporal limit.  To require Clark to

now provide a list of every case on which he has consulted since 1993 would obviate the limitation on this information established by Rule 26.

To the extent the list is arguably relevant to Clark's qualifications to opine as to the specific issues in this matter, in addition to Clark's Rule 26 disclosure Defendant also has Clark's *sworn deposition testimony* regarding: the number of times he has been involved in a case on behalf of a defendant rather than a plaintiff (by his own count very, very few), the proportion and type of cases in which he has been involved in which the issue was the training and supervision of correctional officers, the number of times he has appeared in a case involving CoreCivic, and the number of times he has been involved in a case regarding a detention facility and/or the alleged failure of a detention facility to get a detainee to medical treatment when needed, which Clark allowed was not an extensive number. Notably, none of Clark's answers to defense counsel's deposition questions were evasive, *see* Fed. R. Civ. P. 37(a)(3), and Clark consulted the list only to facilitate an accurate answer to defense counsel's questions.

Furthermore, based on the deposition transcript, there is every indication that defense counsel was thoroughly familiar with Clark's consulting history. And there is no indication in the record, Clark's Rule 26 disclosure, or the deposition transcript, that any contents of the numerical list of cases is relevant to the issues on which Clark is to opine in this matter, or would demonstrate any bias beyond that allowed in Clark's deposition testimony, i.e., that he very seldom testified on behalf of a defendant. Defense counsel is thoroughly familiar with Clark's background and qualifications, or lack thereof, as is evidence by his questioning of Clark during the deposition. Defense counsel's familiarity with Clark's background as an expert witness is also evidenced by the motion filed by counsel's firm in the Sanchez matter; the Court notes that in that similar matter CoreCivic did not seek to disqualify Clark as an expert regarding CoreCivic's obligation to ensure that a detainee is provided medical care when the need is known to a CO, although counsel's firm moved exclude Clark's expert opinions based on factors other than Clark's expertise.

Defendant does not seek the list to establish bias, but instead seeks information to establish that Clark is not qualified as an expert with regard to the claims against CoreCivic. The resolution of Clark's expertise is not a matter before the Magistrate Judge, but instead would be resolved by Judge Silver presumably at the summary judgement or pretrial motion stage of these proceedings. Nonetheless, Defendant appears to argue a motion to disqualify Clark as an expert in the motion to compel:

> Mr. Clark testified that he has "consulted" as an expert on approximately 2,393 cases since 1993. (Ex. 1 at ¶ 10.) [footnote 1: Based upon his Curriculum Vitae and his deposition testimony, it is clear that Roger Clark is a police procedures expert, and has little to no experience in a jail, prison, or detention setting other than an 18-month stint as an officer at the LA. County Jail from May November 1967—over 55 years ago. (*See* Ex. 1, Att. 1 at 54:16-56:22; 60:23-61:23.)]
>
> Plaintiffs disclosed Roger Clark as an expert on "potential non-medical negligence by staff at the Eloy Detention Center." (Ex. 1 at ¶ 4; *see also* Dkt. 160 at 2.) Clark's expert report opines, among other things, that CoreCivic and its officers fell below the standard of care by generally failing to provide the decedent with sufficient access to medical care. (Ex. 1 at ¶ 4.) Attached to the expert report was an "Updated List of Sworn Testimony For Rule 26" dated February 23, 2018 to February 25, 2022 pursuant to Fed. R. Civ. P. 26(a)(2)(B)(v). (*Id.*)

(ECF No. 185 at 1-2 & n.1).

Accordingly, the Court offers the following.

The burden is not on the party seeking to exclude an expert's testimony or disqualify the individual as an expert, but on the *proponent* of the expert to establish they fit within the bounds of Rule 702. *See Lust By & Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996), *cited in Zeiger v. Wellpet LLC*, 526 F. Supp. 3d 652, 667 (N.D. Cal. 2021) (also citing the advisory committee's notes to Rule 702). *See also In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 549 (C.D. Cal. 2014); *Edmons v. Home Depot, U.S.A., Inc.,* 2011 WL 127165, at \*6 (D. Or. Jan. 14, 2011); *Shalaby v. Irwin Indus. Toll Co.*, 2009 WL 7452756, at \*7 (S.D. Cal. July 28, 2009); *Harrison v. Howmedica Osteonics Corp.*, 2008 WL 906585, at \*8 (D. Ariz. Mar. 31, 2008); 29 CHARLES ALAN WRIGHT, VICTOR JAMES GOLD, FEDERAL PRACTICE AND PROCEDURE § 6264.3 (2d ed.) ("the party proffering a

witness as an expert has the burden of laying a foundation that establishes the witness is qualified"). *Cf. Building Indus. Ass'n of Wash. v. Washington State Bldg. Code Council*, 683 F.3d 1144, 1154 (9th Cir. 2012) ("The party offering expert testimony has the burden of establishing its admissibility."). Whether a proffered expert witness has sufficient qualifications is a matter left to the District Court's discretion. *See*, *e.g.*, *General Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *Cooper v. Brown*, 510 F.3d 870, 876 (9th Cir. 2007).

Rule 702 requires that an expert be qualified, and that the expert's testimony be both relevant and reliable. *Estate of Barabin*, 740 F.3d at 463; *United States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir. 2001). Relevancy "simply" requires that the evidence advance a "material aspect" of the party's case. *Cooper*, 510 F.3d at 942. Reliability requires the court to assess whether an expert's testimony has a "reliable basis in the knowledge and experience of [the relevant] discipline." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (brackets in original). Notably, to be qualified a purported expert's experience need not consist of prior expert witness testimony on the same issue. *See United States Fidelity & Guar. Co. v. Ulbricht*, 576 F. Supp. 3d 850, 860 (W.D. Wash. 2021); *In re ConAgra Foods, Inc.*, 302 F.R.D. at 550-51; *Tedone v. H.J. Heinz Co.*, 686 F. Supp. 2d 300, 309 (S.D.N.Y. 2009). Any "lack of particularized expertise bears on the weight of the testimony, not its admissibility." *Bessler v. City of Tempe*, 2021 WL 3089104, at *14 (D. Ariz. July 22, 2021), *citing Contreras v. Brown*, 2019 WL 2080143, at *2 (D. Ariz. May 10, 2019). "Disputes as to the strength of [an expert's] credentials ... go to the weight, not the admissibility, of [their] testimony." *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). Exclusion of expert testimony remains "the exception rather than the rule." Fed. R. Evid. 702, advisory committee notes to 2000 amendments.

Mr. Clark's resume is extensive, and includes a Masters-equivalent course of study ("requiring a thesis") in police administration, and two years as a jail administrator. He was

the jail's "Facility Training and Logistics Administrator," and the facility included a hospital. (ECF No. 188-1 at 19-20). Although the majority of Clark's experience and his post-retirement consulting has been in the area of police procedures involving investigation of serious crimes, arrests, and the use of force by police officers, he has also "testified as an expert on … jail procedures and jail administration." (ECF No. 188-1 at 21). He has been certified as an expert witness in seventeen federal courts. (ECF No. 188-1 at 21). As recently as 2018, the United States District Court for the Southern District of California found Clark qualified as an expert in the Sanchez case, a matter involving allegations and raising issues similar to those presented in this matter. *See supra* at footnote 3. In addition to offering deposition and trial testimony, Clark has submitted written opinions in other matters. (ECF No. 188-1 at 21). His expert witness reports, including on the topic of training, discipline, and supervision in law enforcement contexts, have been quoted in several published federal court opinions, including by the Ninth Circuit Court of Appeals. (ECF No. 188-1 at 22-23). In his Rule 26 report Clark cites (using the published opinion or case number) to no less than 40 federal court cases in which his "expert report" supported argument, was mentioned in a published opinion, or where he offered testimony; although by his own admission the vast majority of these cases involved the use of excessive or deadly force, Clark also specifies a Fifth Circuit case involving "in-custody hyperthermia deaths," and a Ninth Circuit case involving "in-custody suicidal prisoners." (ECF No. 188-1 at 24-25).  Clark avers he has "been found competent by both Federal and State Courts to render opinions as to responsibilities as occurred in this case." (ECF No. 188-1 at 26).

## IV.    Conclusion

As detailed *supra*, Clark provided the requisite Rule 26 information identifying every case in which he testified at trial, at a hearing, or via a sworn deposition, in the four years prior to his deposition, a total of several hundred cases. (ECF No. 188-1 at 28). As is evident from the deposition transcript, Defendant's counsel has investigated Clark's history with regard to his testimony in civil cases and the cases in which he gave deposition testimony or trial testimony in the four years prior to his deposition in this matter, and was

familiar with, or had access to, Clark's history and areas of expertise from the California Sanchez matter and the Nevada Rivera matter. Requiring Clark to provide a list of some 2000 case names on which Clark has consulted since 1993, when Clark allowed (under oath) the limited number of times he has been involved in cases factually similar to the instant matter, is not warranted. The list and this information are not relevant to the issues in this matter, are not proportional to the needs of the case, and are not probative of the issues remaining for resolution.

Noting that this type of discovery is allowed to establish bias, as compared to an expert's actual qualifications, Defendant has only arguably met their burden of establishing the relevance of the sought-after discovery, i.e., that providing the "list" would be relevant to an as-of-yet unfiled motion to disqualify Clark as an expert (wherein the Plaintiffs would have the burden of establishing his expert qualifications). Defendant asserts only that the list will reveal Clark has consulted in very few cases which are factually similar to the instant matter. In effect, Defendant seeks to prove a negative with the requested discovery, i.e., that the list will reveal Clark has limited experience as a consultant in cases involving the failure to provide access to medical care in a detention setting, and the detention facility's training and supervision of correctional officers in this specific circumstance. However, Clark has already acknowledged that the vast majority of his consulting work has been in a different context. Accordingly, the Court will not exercise its discretion to require that Clark produce the list he consulted during his deposition to Defendant.

**IT IS THEREFORE ORDERED that** Defendant CoreCivic's motion at ECF No. 185 is **denied**.

Dated this 9th day of January, 2023.

Camille D. Bibles
United States Magistrate Judge

- 23 -